Jack L. HOWARD, Appellant,

v.

STATE of Alaska, Appellee.

No. 3089.

Supreme Court of Alaska.

Sept. 1, 1978.

---

Rita T. Allee, Birch, Horton, Bittner & Monroe, Fairbanks, for appellant.

Jay R. Dove, Legal Intern, Harry L. Davis, Dist. Atty., Fairbanks and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

RABINOWITZ, Justice.

After trial by jury, Jack Howard was found guilty of the crime of grand larceny.[1] The superior court ordered imposition of sentence to be suspended for a period of six months and Howard to be placed on unsupervised probation during that period.[2] Howard was also ordered to pay $1,000 in court costs and to make restitution to Alyeska Pipeline Service Company in the amount of $101.

In this appeal, Howard has advanced 11 separate specifications of error, the most significant of which attack several of the superior court's instructions to the jury. In order to understand our disposition of the

---

1. Howard was jointly indicted and tried for the crime of grand larceny with Ed Mooney. Mooney was also found guilty of grand larceny and received the same sentence as Howard. Mooney has not appealed his conviction.

In its pertinent parts, the indictment in the case at bar reads:

That on or about the 28th day of January, 1976, at or near Toolik Camp, in the Fourth Judicial District, State of Alaska, Ed Mooney and Jack L. Howard did wilfully, unlawfully and feloniously take, steal and carry away, with intent to deprive the owner thereof, property of value, to-wit: Approximately eight (8) 55 gallon barrels loaded with scrap copper, said items being the property of Alyeska Pipeline Service Co. and having a total value in excess of $100.

2. AS 11.20.140, as it read before being recently amended, provided, in part:

*Larceny of money or property.* A person who steals money, goods, or chattels . . . which is the property of another, is guilty of larceny. Upon conviction, if the property stolen exceeds $100 in value, a person guilty of larceny is punishable by imprisonment in the penitentiary for not less than one nor more than 10 years. If the property stolen does not exceed $100 in value, the person, upon conviction, is punishable by imprisonment in a jail for not less than one month nor more than one year, or by a fine of not less than $25 nor more than $100.

appeal, we deem it appropriate to set forth the salient factual background of the case.

In November 1975, a Nana Security guard working for Alyeska at Toolik Camp on the Trans-Alaska Pipeline was informed by a pipeline worker that there was a plan to "rip-off" scrap copper that had been collected from the camp. The informant indicated the names of the persons who were allegedly planning to "rip-off" the copper scraps. However, neither the appellant nor his co-defendant were named by the informant. After a search of the camp, the scrap copper was located in open view in eight 55-gallon drums of the type used for collecting garbage and material to be incinerated. The copper observed in the barrels was "obviously scrap copper." The barrels were placed under surveillance. Subsequently, the barrels in question were marked with a red capital "T," approximately 3 by 5 inches and about 2 inches below the top lip of each barrel.

On January 28, 1976, approximately 2½ months after the initial discovery of the barrels of scrap copper, a Nana Security guard observed three men loading the barrels on a flatbed truck. One of the men from the truck approached the guard and chatted with him about the weather and other matters. This man was later identified at trial as Mooney, the co-defendant. Howard was identified as one of the other men on the truck. About an hour and a half later, the security guard noticed the same type of truck containing a few 55-gallon barrels parked at another location in camp. He wrote down the truck and trailer numbers in his notebook. The numbers were later transferred to his log.

The truck was subsequently checked through the Yukon River checkpoint at 3 a. m. the following day, January 29. The security guard on duty testified that he noticed one barrel marked with an orange "T." The bill of lading accompanying the truck and its load had been altered to indicate that 23 barrels were authorized. A "2" had been added in front of the original "3."

A few days later, Robert Jenkins, an investigator for Nana Security, contacted Daniel Fraser, North Pole Chief of Police. Through the information he had received, Jenkins found that the truck belonged to Howard, a North Pole resident. Jenkins had been aware of the surveillance of the barrels, had seen them himself, and had tested their weight by pushing them. Jenkins asked Fraser to check the Howard residence to determine if there were any barrels on the premises matching the description of the ones which had been removed from Toolik Camp. Jenkins described to Fraser that the barrels he was looking for had 2 by 4's on top, held on with metal straps with orange or reddish "T's" on the sides.

Chief Fraser drove to the Howard residence the following morning. After driving approximately 150 feet past the Howard residence on H. & H. Lane, Chief Fraser observed seventeen 55-gallon drums on Howard's property. Some of the barrels had their lids fastened down with 2 by 4's and held on with metal straps. Fraser did not observe any reddish "T's" on the barrels. The barrels were 40–50 feet from Fraser when he first observed them. He did not approach them at this time, but returned to North Pole and informed Jenkins of what he had seen. Jenkins then came to North Pole and with Chief Fraser returned to where the barrels had been observed. They drove up a driveway and approached to within 5–10 feet of the barrels. A positive identification of the barrels was made at this time, including verification of the red "T's." At no time did either man leave their truck. The pair subsequently returned to North Pole.

Jenkins went to the Alaska State Troopers in order to get their assistance in obtaining a search warrant. A search warrant was obtained at approximately 6–7 p. m. As the time was late and the warrant was for daylight only, Jenkins did not return to the Howard residence that evening. The following morning Fraser again visited the location and found the barrels missing and the area scraped clean. Jenkins was informed and he visited the scene and confirmed that the barrels were gone.

Several witnesses who worked at Toolik Camp testified that the collection of scrap copper was open, and it was common knowledge that scrap copper had been collected by a number of people. None of these witnesses received any direction or order not to collect scrap copper. They also testified that once the scrap was taken to the incinerator for burning it was thrown into the camp dump and buried.

In contrast, William Rickett, manager of Alyeska's Pipeline Materials Department, testified that it has always been Alyeska's policy to attempt to return every "last bit of scrap metal" from the pipeline camps. In fact, Rickett knew that some scrap was being disposed of. He never issued any directions as to Alyeska's "policy" regarding scrap materials until one week before trial.

Nathan Kile was the resident camp manager at Toolik Camp at the time of the alleged theft. Kile or his subordinates were responsible for the approval of the backhaul of scrap materials to Fairbanks. No permission was given by Kile as to the movement of scrap copper out of the camp in January 1976. Kile delegated his authority to determine which scrap was to be shipped back and which was to be buried to Mr. Yelton, the camp maintenance supervisor.

Yelton was aware of Mooney's collection of the scrap copper. He testified that if Mooney had not collected the copper and removed it from the rest of the trash, it would have been buried. Mooney had collected the scrap copper from trash after it had been burned. During the time of collection (a period of several months), Mooney was in charge of the incinerator. He stopped collecting copper when he became labor foreman. As the labor foreman, it was Mooney's responsibility to remove the scrap and junk from the incinerator area to the dump. Sometime in January 1976, Yelton had a conversation with Mooney re-

garding the backhaul of copper. At that time, Yelton told Mooney it would be "illegal" to backhaul the copper. Yelton was referring to the unauthorized backhaul of private materials on a truck carrying materials for Alyeska, for which Alyeska would be charged. The load that Howard brought back was not charged to Alyeska since it was a private backhaul for Bayless and Roberts to whom Howard had leased the truck.

On January 28, 1976, Mooney and Howard were put in contact with each other by Joel Willis, the carpenter foreman at Toolik. Mooney assured Howard that the copper was not stolen. The truck Howard was driving was then loaded. Howard left Toolik later that evening.

■ We turn initially to Howard's specifications of error which treat the subject of the superior court's jury instruction pertaining to the issues of intent and abandonment of the copper. As one of his specifications of error, Howard contends that the superior court erred in giving the following instruction over Howard's objection:

It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. So unless the contrary appears from the evidence, the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused.

The legal propriety of this instruction is answered by our recent opinion in *Menard v. State*, 578 P.2d 966 (Alaska 1978). In *Menard*, we reviewed the judicial history of the *Mann* instruction [3] and concluded that the giving of such an instruction was error. In so doing, we said:

We are persuaded by the extensive criticism which this instruction has

---

**3.** The questioned instruction in this case is identical to that given in *Mann v. United States*, 319 F.2d 404, 407 (5th Cir. 1963), *cert. denied*, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d

474 (1964). In the case at bar, Howard filed a written objection to this instruction prior to the court's instructing the jury.

evoked. We hold that the giving of the *Mann* instruction is error, and we admonish Alaska trial courts to cease using it. Like the Fifth Circuit, however, we decline to hold that this error will always be deemed reversible.[4]

In reaching this conclusion, we found persuasive the reasoning of the Fifth Circuit in *United States v. Chiantese*, 560 F.2d 1244 (5th Cir. 1977). There the court directed the trial courts in the circuit to cease using the *Mann* instruction, or others like it, which could reasonably be interpreted as shifting the burden to the accused to produce proof of innocence. We noted that the Fifth Circuit concluded that the error in giving such charge shifting the burden would not be overcome because other phrases correctly defining the proper burden of proof were included in the instructions. In *Menard*, we further observed:

> [T]he majority in *Chiantese* held that the giving of the *Mann* instruction, whether objected to or not, was not the type of error which would automatically produce reversal. Instead, the court stated that if the error should recur, its harm to the accused would be weighed in the context of each case. The court made clear that such weighing would not include consideration of whether a defective charge had been cured by prior or subsequent instructions.[5]

In *Menard*, we concluded that the error in giving the *Mann* instruction was "harmless beyond a reasonable doubt"[6] since the jury acquitted Menard of the specific intent charge, stabbing with intent to wound, but found him guilty of the general intent crime of assault with a dangerous weapon.[7] Unlike *Menard*, we cannot conclude, on the basis of the record in the case at bar, that the superior court's use of the *Mann* instruction was harmless beyond a reasonable doubt.

First, it is apparent that Howard was charged and convicted of a specific intent crime, namely, grand larceny. The jury was properly instructed that a necessary element of the crime was that Howard have "the specific intent to deprive the owner of his property at the time the taking and carrying away took place, and unless such intent so exists, the crime of larceny is not committed."[8] Secondly, not only could the superior court's giving of the *Mann* instruction be reasonably interpreted as shifting to the accused the burden of proving his innocence, but other instructions of the superior court erroneously placed the burden of proof on Howard. The superior court instructed the jury:

> Abandonment of property is the voluntary relinquishment of a thing by its owner coupled with his intention to terminate ownership, possession and control of it. The owner's intent to abandon his

---

**4.** *Menard v. State*, 578 P.2d 966, 970 (Alaska 1978).

**5.** *Id.* at 970 (citations omitted). We note here, moreover, that the standard for reversible error differs depending on whether the defendant has made a timely objection to the instruction given. Alaska Rule of Criminal Procedure 47 provides:

> (a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.
> (b) Plain Error. Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Unless a defendant challenges a jury instruction "before the jury retires to consider its verdict," the point cannot be given consideration on appeal, unless there exists plain error. Alaska R.Crim.P. 30(a); *Larson v. State*, 569

P.2d 783, 787 (Alaska 1977); *Evans v. State*, 550 P.2d 830, 843 (Alaska 1976).

**6.** *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, 711 (1967); *cf. Love v. State*, 457 P.2d 622 (Alaska 1969).

**7.** We noted that "[t]he jury did not have to find any specific intent to do any particular kind or degree of harm to the victim in order to find Menard guilty of assault with a dangerous weapon." *Menard v. State*, 578 P.2d 966, 970 (Alaska 1978).

**8.** In regard to the elements of the crime of larceny, the superior court earlier instructed the jury that larceny consists of two elements:

> 1. An intent to permanently deprive the owner of some certain property having any intrinsic value; and
> 2. A carrying away of the property. . . .

property is the essential element of abandonment and must be evidenced by his decisive and unequivocal act(s). *The party alleging abandonment has the burden of proving it by clear and convincing evidence.* (emphasis furnished)

▮ In regard to the issue of abandonment, it is of significance that the superior court informed the jury that a component element of larceny is an intent on the part of the accused permanently to deprive the owner of some certain property. The court further elaborated on this aspect of the case by telling the jury that the property in question must belong to another person. These instructions of the superior court are in accord with Alaska's statutory provisions which delineate the crime of larceny.[9] Thus, in the case at bar, it was essential that the prosecution prove beyond a reasonable doubt, as an essential element of its case, that Howard took the scrap copper with the intent permanently to deprive Alyeska of its possession.[10] Furthermore, once sufficient evidence had been adduced either by Howard or his co-defendant concerning Alyeska's purported abandonment of the scrap copper, it then became incumbent upon the prosecution as part of its overall burden of proof to demonstrate beyond a reasonable doubt that the scrap metal was not abandoned at the time the alleged larceny was perpetrated. If the copper was in fact abandoned, then it was

neither owned by nor in the possession of another person or entity and thus could not be the subject of a larceny.[11]

In short, the superior court's abandonment instruction erroneously placed upon the defendant the burden of proving by "clear and convincing evidence" that the copper had been abandoned by Alyeska. Since an essential element of the crime of larceny is that the property taken be that of another, it was the state's burden to prove beyond a reasonable doubt that the copper belonged to Alyeska and was not abandoned at the time the alleged larceny occurred. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 361–63, 90 S.Ct. 1068, 25 L.Ed.2d 368, 373–74 (1970); *Toomey v. State,* 581 P.2d 1124 (Alaska 1978).[12]

▮ On the basis of the foregoing, we conclude that Howard's conviction must be set aside and the matter remanded for a new trial. We cannot say with any degree of assurance that the superior court's errors in giving the *Mann* instruction and the burden of proof-abandonment instruction was harmless error either under the *Chapman* standard or the standard of *Love v. State,* 457 P.2d 622, 631 (Alaska 1969).[13]

▮ In order to assist the parties and the superior court in the event the matter is retried, we will briefly address several of

---

**9.** See note 2, *supra*, for the text of AS 11.20.-140, Alaska's larceny statute. *See also Mahle v. State*, 392 P.2d 19, 21 (Alaska 1964).

**10.** *Pulakis v. State*, 476 P.2d 474, 475 (Alaska 1970).

**11.** *Commonwealth v. Meinhart,* 173 Pa.Super. 495, 98 A.2d 392, 394–95 (1953); *State v. Hayes,* 136 W.Va. 199, 67 S.E.2d 9, 16 (1951); *Busler v. State,* 181 Tenn. 675, 184 S.W.2d 24, 27 (1944).

**12.** *Compare Batson v. State,* 568 P.2d 973, 978 (Alaska 1977), where this court held that the standard of proof required of the party asserting an entrapment defense is that of a preponderance of the evidence. In *Batson,* we also took note that entrapment "deals with facts which are in essence collateral to the central inquiry of the guilt or innocence of the accused." Id. at 978.

Further, in *Ferguson v. State,* 488 P.2d 1032, 1038 n.21 (Alaska 1971), we commented that it would be erroneous for a jury to believe that a defendant has the burden of proving his alibi defense.

**13.** *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), established the standard for harmless error involving the denial of a federal constitutional right in a state criminal case. In order for such an error to be harmless, the reviewing court must be satisfied "beyond a reasonable doubt" that the error did not contribute to the defendant's conviction. *Id.* at 24, 87 S.Ct. 824, 17 L.Ed.2d at 711. Where a constitutional right is not involved, *Love v. State,* 457 P.2d 622 (Alaska 1969), governs. In *Love* we found the proper test for harmless error to be whether the error "appreciably affect[s] the jury's verdict." *Id.* at 632.

Howard's remaining specifications of error. Concerning the trial court's instructions, Howard takes the position that it was error to refuse a requested instruction that his subjective belief that the copper was abandoned would preclude a finding that he had the necessary specific intent to commit the crime of larceny.[14] As mentioned previously, the superior court specifically instructed the jury that a necessary element of the crime of larceny

> is the existence in the mind of the perpetrator of the specific intent to deprive the owner of his property at the time the taking and carrying away took place, and unless such an intent so exists, the crime of larceny is not committed.

In light of the fact that this instruction was given, we do not find that the superior court abused its discretion in rejecting appellant's requested instruction pertaining to his subjective belief.[15] In our view, the subject of intent was adequately covered in the above-quoted instruction.[16]

Howard next makes two evidentiary attacks on the jury's verdict. First, he contends that as a matter of law the jury had no other alternative but to find that the copper was abandoned. Secondly, Howard asserts that the government's evidence was insufficient to prove that he had the requisite specific intent to commit the crime of larceny as charged. In our view, the evidence relating to the issue of abandonment, although conflicting, was sufficient to preclude a judgment of acquittal for Howard.[17] We think there was substantial evidence, adequate to support a conclusion by a reasonable person beyond a reasonable doubt, that the copper in question was not abandoned. Beck v. State, 408 P.2d 996, 997 (Alaska 1965).

We reach a similar conclusion regarding Howard's assertion that there was insufficient evidence to prove he had the specific intent permanently to deprive Alyeska of the scrap copper. As we noted at the outset of this opinion, evidence was introduced that the bill of lading which accompanied Howard's truck had been changed. The jury also had the prosecution's evidence of the observation of the marked barrels at Howard's residence, and the fact that the day after they were observed the Toolik barrels could not be seen on Howard's property and the area where they were previously situated had been scraped clean. When questioned a few days subsequent to the sighting of the barrels by law enforcement officials, Howard denied knowledge of the barrels containing scrap copper on his premises. Thus, we conclude that there is no merit in this particular specification of error.[18]

14. Howard proposed the following instruction: Knowledge is necessary to intention. If you find that the defendant[s] did not know or did not realize the fact that they were converting for their own use property of value belonging to another, but find that they honestly believed that the scrap copper was abandoned, then this is equivalent to finding that the taking was committed without the requisite criminal intent and you must acquit the defendants.

15. The giving or refusal to give a particular instruction lies within the sound discretion of the trial court. Buchanan v. State, 561 P.2d 1197, 1207 (Alaska 1977). See Alaska R.Crim.P. 30.

16. This is not to say that we would determine it to be an abuse of discretion if the superior court had given the requested instruction.

17. The state introduced the testimony of William Rickett, who was in charge of all materials sent to and from the camps along the pipeline.

Rickett testified it was Alyeska's policy that all scrap would be returned to Fairbanks. He also knew that some material was being thrown away. Scrap from the pipeline camps had been backhauled and then placed for sale in Fairbanks.

Nathan Kile, resident camp manager at Toolik, to whom Rickett had delegated the authority to determine what was to be backhauled, testified that scrap material had been backhauled to Fairbanks. He also testified that some is buried and some is shipped back.

Charles Conaway, a Nana Security guard, testified that it was generally Alyeska's policy that nothing of Alyeska's would be allowed out of camp. Conaway was speaking of tools, bedding and food. He was unaware of any policy regarding scrap.

18. Howard also claims that the state's evidence of value was insufficient to sustain a conviction of grand larceny. The jury determined that the value of the property allegedly stolen was in excess of $100.

Two remaining specifications of error will be mentioned.[19] Howard claims that since the act of larceny, if any larceny in fact occurred, was completed before he transported the barrels containing the scrap copper, he should not have been charged with the crime of larceny.[20] We find this contention devoid of merit. According to the state's evidence, Howard assisted in the transportation of the stolen scrap metal from the owner's premises. Given the abolition in Alaska of the distinction between principals and accessories before the fact,[21] we hold that Howard was properly charged with the crime of larceny.[22]

Lastly, Howard contends that the superior court erred in refusing to suppress the testimony of Jenkins and Fraser concerning their positive identification of the barrels which they observed, without the benefit of a search warrant, on Howard's property.

Of the two sightings of the barrels at Howard's residence, only the last sighting is claimed to have been a trespassory intrusion without a search warrant. The initial sighting of the barrels was by Chief Fraser from H. & H. Lane, a public road, at a distance of 40–50 feet. He observed four or five barrels that appeared burned, out of a total of 17. He also observed that some of the tops of the barrels were held on with 2 by 4's, part of the description given to him by Jenkins. Chief Fraser left the area of Howard's residence and returned to North Pole where he contacted Nana Investigator Jenkins. The two of them returned to H. & H. Lane. From the position where Fraser first observed the barrels, the two left H. & H. Lane and drove up an access road or driveway that apparently was used by Howard as an access to his lumber building. It was not until they had turned onto the access road that the barrels could be identi-

---

In *Hoffman v. State*, 24 Okl.Cr. 236, 218 P. 176, 179 (1923), the court stated, in part:

If the evidence of value at the place of the larceny is not clear and explicit, such evidence of value at other places sufficiently near and in like situation[s] may be received as will reasonably tend to establish a fair value.

*See also People v. Miller*, 549 P.2d 1092, 1094 (Colo.App.1976), *aff'd* 566 P.2d 1059 (Colo. 1977); *State v. Landlee*, 85 N.M.App. 449, 513 P.2d 186 (1973).

In the case at bar, Marlin Dean Markland of Dean's Glass and Salvage in Fairbanks was called as an expert witness by the state. Markland's business involves the purchase of scrap copper in almost any amount. Markland testified that at the time of the theft, the market value of scrap copper in Fairbanks was between 25 and 40 cents a pound. According to Markland, each 55-gallon barrel of copper would weigh between 500 and 1,500 pounds. He also testified that the price paid for copper varied with the cost of freighting. In response to a question as to whether he would deduct the price further if he were in North Pole collecting copper, Mr. Markland said, "We would, yes."

Given the foregoing testimony, we find that the state's evidence of value was sufficient to support a conviction for the crime of grand larceny.

**19.** Our holding that a new trial is necessary because of prejudicial error in the court's instructions has made it unnecessary to address several of Howard's specifications of error. More particularly, our resolution of this appeal calling for a new trial has obviated the need to pass on the merits of whether Howard was prejudiced by virtue of his being jointly tried with Mooney. We note that Mooney has not appealed from his conviction, and thus it is unnecessary for us at this time to decide whether the superior court's denial of Howard's motion for relief from prejudicial joinder was error.

Similarly, we decline to pass upon Howard's contentions that the superior court erroneously allowed the jury to consult their notes and certain diagrams made by witnesses which were not formally made exhibits. We do note that the trial court is empowered, in its discretion, to permit jurors to take and use notes during trial and their deliberations. *Alaska State Housing Authority v. Contento*, 432 P.2d 117, 122 (Alaska 1967).

**20.** Howard contends that he should have been charged with the crime of receiving stolen property, AS 11.20.350, instead.

**21.** AS 12.15.010 abrogates the distinction between an accessory before the fact and a principal offender in a criminal case. Although accessories after the fact still constitute a separate class, Howard participated directly in the theft and did not merely "conceal or aid the offender" after the commission of the felony. AS 12.15.020.

**22.** *Hair v. State*, 294 P.2d 846, 849–50 (Okl.Cr. 1956); *Shacklett v. State*, 23 Okl.Cr. 4, 211 P. 1063, 1065 (1923).

fied as those with the Toolik markings. The pair stopped about 5–10 feet from the barrels and observed one barrel that had fallen over and was spilling its contents. These contents were described as copper wire, "maybe generator wire."

■■■■ Resolution of the suppression issue turns on whether the portion of Howard's property in question (*i. e.,* Howard's access driveway) was commercial property.[23] More particularly, the trial court must determine whether the general public had access to this area of Howard's property for commercial purposes. If the road was available to the public for Howard's commercial purpose (*i. e.,* the sale of lumber), then the two officials did not need a search warrant to view the barrels from Howard's access road. Upon retrial, the trial court should make specific findings in regard to this search and seizure issue in ruling on any suppression motion that is made.[24]

Reversed and Remanded for new trial.[25]

---

**23.** Property which has been converted for commercial use and is open to the general public is entitled to less privacy protection under the federal Fourth Amendment than a purely private dwelling. In *Lewis v. United States,* 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312, 316 (1966), the Supreme Court stated:

Without question, the home is accorded the full range of Fourth Amendment protections. But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. *A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purpose contemplated by the occupant.* Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials

. . . .

(emphasis added) (citations omitted). In *Woods & Rohde, Inc. v. State Dept. of Labor,* 565 P.2d 138, 139 n.1 (Alaska 1977), this court distinguished private business premises not

open to the general public from those areas which are open to public entry in holding unconstitutional a state statute, AS 18.60.083(a), which permitted warrantless searches of private business premises to determine compliance with Alaska's Occupational Safety and Health Act. *See also Marshall v. Barlow's, Inc.,* —— U.S. ——, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

**24.** The record does not reflect the superior court's rationale for denying the suppression motion.

**25.** We do not reach the merits of Howard's contentions that certain statements that co-defendant Mooney made to Nana Security officers and an Alaska State Trooper should have been suppressed because no *Miranda* warning was given to Mooney. As mentioned previously, Mooney did not appeal and therefore if a retrial is held, Howard will be the only defendant on trial. Given the significant change in Mooney's status in relation to any new trial which is to be held, we think it ill-advised to attempt any discussion at this time of the merits of Howard's suppression motion concerning Mooney's statements.