Michael CARMAN, Appellant,

v.

STATE of Alaska, Appellee.

No. 3555.

Supreme Court of Alaska.

Nov. 30, 1979.

Allan Beiswenger, Asst. Public Defender, Bethel, Brian Shortell, Public Defender, Anchorage, for appellant.

Victor Krumm, Dist. Atty., Bethel, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

Linda L. Walton, Rice, Hoppner, Hedland, Fleischer & Ingraham, Fairbanks, for appellant.

Randy M. Olsen, Asst. Dist. Atty., Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

CONNOR, Justice.

In the early morning hours of December 7, 1976, the Cinema II theater in Fairbanks was robbed at gunpoint by two men wearing ski masks. According to the testimony of Steven Parker, the Cinema II employee on duty at the time, the two robbers entered the establishment about 2:30 a. m. and demanded that the employee give them all the money on the premises and a .357 caliber high standard revolver that was kept behind the counter. Parker described both robbers: one was about five feet, six inches, tall, carried a .45 caliber pistol, and wore a blue down jacket and blue ski mask that revealed a blond moustache. The other was "about 3 or 4 inches taller," carried a .38 caliber pistol, and wore dark clothing and a black ski mask. Parker testified that he gave the two the pistol, along with its brown holster, and about three hundred dollars in cash, all of which was stuffed into an old green canvas duffle bag that the two had brought with them into the theater. The assailants then instructed Parker not to leave the premises for five minutes, whereupon they made their exit. Parker then attempted to telephone the police, but dis-

covered that the phone was not working. When the police finally did arrive, they discovered that the telephone wires outside the building had been cut.

The ensuing investigation eventually focused on appellant Carman and one of his roommates, Brock Bean. Together they shared an apartment at 23 D Eureka Street in Fairbanks with four other individuals: Ken Johnson, Steve Evans, and two brothers, Don and Jim Drum. The police subsequently obtained a warrant to search their apartment for the handguns, clothing, and duffle bag involved in the robbery. At the time the warrant was served, appellant's sister Cherie Carman, was visiting the apartment. She and the other people on the premises were instructed to line up along the wall in the living room while the officers conducted their search. Detective Keller, who was in charge of the investigation, then entered a back bedroom where Ms. Carman had been when the police first entered the apartment. There he found a closed, opaque purse lying on the floor. Upon opening it, he discovered and seized a brown leather holster matching the description of the one stolen in the robbery. He then learned that the purse belonged to Cherie Carman.

On January 6, 1977, an indictment was returned charging Michael Carman and Brock Bean with violation of AS 11.15.240 [1] and AS 11.15.295 [2] in the armed robbery of the Cinema II. Their cases were subsequently severed for trial.

In its case against Carman, the state relied principally upon the testimony of Parker, three of Carman's roommates, Johnson, Evans, and Don Drum, and a friend of theirs, Alma Wheeler. Parker's testimony has been summarized above. Next to testi-

fy was Steve Evans. He stated that as of December 7, 1976, the group was in arrears in their rent payments on the apartment. He further stated that on or about December 6th, Carman had told him that "they might do a job so they needed some ski masks" and that, as a result, Evans went out and purchased two ski masks for the purpose of "doing a job;" that is, a "hold up." Evans admitted that he paid for the masks from his own funds, and that he had lied to the grand jury in order to protect himself when he previously testified that he bought the ski masks for work and snow machine riding. Evans stated that he considered Carman a friend and that Carman was "always saying that [they] was [sic] all partners." Evans also testified at trial that a few hours before the robbery he left the apartment "to cool off" after he and Carman had a fight. When he returned, according to his testimony, Carman and Bean were gone. He then testified that Carman and Bean returned to the apartment about 2:30 a. m., and, that Carman stated "that it went down and that [they] should've seen the look on the guy's face." Evans claimed that Carman told him they got one hundred and eighty dollars and showed him a .357 caliber high standard revolver which Carman said came from the Cinema II.

The next witness to testify for the state was another of Carman's roommates, Donald Drum. He testified that a few days prior to the robbery, he and Carman had been driven to the Cinema II for the purpose of cutting the telephone wires outside the establishment. He claimed that Carman actually did the cutting while he and the driver, Allen Isaacson, waited in the car. Drum also stated that Carman later paid Isaacson eleven dollars to use Isaac-

1. AS 11.15.240 provides:
   "*Robbery.* A person who, by force or violence, or by putting in fear, steals and takes anything of value from the person of another is guilty of robbery, and is punishable by imprisonment in the penitentiary for not more than 15 years nor less than one year."

2. AS 11.15.295 provides:
   "*Use of firearms during the commission of certain crimes.* A person who uses or carries a firearm during the commission of a robbery, assault, murder, rape, burglary, or kidnapping is guilty of a felony and upon conviction for a first offense is punishable by imprisonment for not less than 10 years. Upon conviction for a second or subsequent offense in violation of this section, the offender shall be imprisoned for not less than 25 years."

son's .45 caliber pistol. He also stated that he was present at the apartment when Carman and Bean left to commit the robbery; that Carman wore a green Army field jacket and carried a .38 caliber pistol; that Bean carried a .45 caliber pistol and a green gym bag; and that the two were gone about forty-five minutes. Drum went on to testify that when they returned, Carman stated that "they did it" and later gave his sister, Cherie, the .357 holster with instructions to "put it in her purse and throw it away some place when she left."

Another of Carman's roommates to testify for the prosecution was Ken Johnson. He stated that he had accompanied Carman, Drum, and Isaacson in the stolen car when, a few days prior to the robbery, they drove to the Cinema II and "looked it over." In addition he testified that shortly before the robbery he gave Carman a .38 caliber pistol which he had obtained from his mother's house about two weeks earlier. Johnson also admitted that he knew at the time he gave Carman the weapon that it was to be used in a crime. He further testified that about two hours after he gave Carman the weapon, both Carman and Bean left the apartment with it and a .45 caliber pistol, face masks, and a "blue" gym bag, and that they were gone for about an hour and a half.[3] When they returned, according to Johnson, they had about two hundred dollars in cash and a .357 caliber handgun with a holster that was similar to the one found in Cherie Carman's purse. Johnson went on to state that he counted the money for the two, which Carman allegedly told him came from the Cinema II. Johnson also testified that Carman said the robbery "was sort of easy," that the Cinema II employee had "looked scared," and that he and Bean had returned to the apartment on foot. Finally, on cross-examination, Johnson admitted that he had lied under oath to the grand jury when he testified as to his activities when Carman and Bean returned to the apartment.

Apart from these witnesses and Detective Keller, the state also introduced the testimony of four other persons. Ray Briggs, the manager of the Cinema II, identified the holster recovered from Cherie Carman's purse as being identical to the one which he kept behind the counter of the theater. Mary Louise Johnson, Ken Johnson's mother, testified that she owned a .38 caliber Colt Cobra pistol, that she discovered it missing on December 10, 1976, and that two days later she went to the apartment at 23 D Eureka Street and recovered the weapon after talking to her son.

Another of the state's witnesses, a young woman named Alma Wheeler, testified that in the early morning hours of December 7, 1976, she drove Carman and Bean to a place where they had directed her and dropped them off. She stated that they were carrying a black bag at the time, and she saw that it contained a pistol and two ski masks. She stated that after dropping the pair off, she drove home.

Finally, a young man named Shawn Welch testified that on the evening of December 6, 1976, he visited the Eureka Street apartment and was asked by Carman for a ride to some unknown destination. Welch refused because he was not a licensed driver. He also stated that during his visit he saw Carman with a .38 caliber pistol, and that "someone walked in the house [sic] with a .45 automatic with a shoulder holster." Lastly, Welch testified that a day or two later he returned to the apartment and saw a .357 caliber high standard revolver which Carman later tried to sell to him.

At the conclusion of the state's case, the defense rested. In his closing argument, defense counsel urged generally that the state had not proven its case beyond a reasonable doubt, and that the credibility of the key prosecution witnesses was greatly suspect. Nevertheless, the jury found Carman guilty of the armed robbery and, as a result, he was sentenced to a ten year term of imprisonment.

---

3. Johnson also indicated that at the time Carman and Bean left the apartment, Bean had the .45 caliber pistol in his possession and wore a blue jacket and brown pants.

In appealing his conviction and sentence, Carman has proffered a number of claims of error which we shall address seriatim.

Carman first seeks reversal of his conviction on the ground that the trial court improperly instructed the jury on the matter of proof of specific intent to steal, which is an element of the crime of robbery. Over the objection of defense counsel, the so-called *Mann*[4] instruction on specific intent was given which stated in part:

> It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. *So unless the contrary appears from the evidence*, the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from an act knowingly done or knowingly omitted by the accused. [Emphasis added]

The emphasized language in the above excerpt has been found by this court to pose the danger of an impermissible shifting of the burden of proof from the prosecution to the defendant in that it may suggest to the jury that the defense must prove lack of intent, in conflict with the overriding presumption of innocence with which the accused is endowed under the law. *Menard v. State*, 578 P.2d 966, 968 (Alaska 1978), *quoting Mann v. United States*, 319 F.2d 404, 409–10 (5th Cir. 1963), *cert. denied*, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964). Hence, in *Menard*, which was published subsequent to the verdict in this case, we held that it was error to submit such an instruction and admonished the Alaska trial courts to cease using it. 578 P.2d at 970. We did note, however, that such an error might not always be reversible, and went on to hold that because *Menard* had not been convicted of a crime involving specific intent, the error was harmless beyond a reasonable doubt. *Id.*

In a later case, *Howard v. State*, 583 P.2d 827 (Alaska 1978), we reversed a grand larceny conviction in part because a similar instruction had been given to the jury. There the accused had been charged with stealing large amounts of scrap copper from a construction site. He defended on the grounds that the copper scraps had been abandoned and that, even if not abandoned, that he reasonably believed they were when he took them. In support of this defense, Howard produced several witnesses who worked at the construction site and who testified that the collection of scrap copper was done in the open and was a matter of common knowledge. Moreover, the witnesses testified that they had never been ordered to stop collecting the scrap and that when it was not collected it was thrown into the camp dump and buried. Under these circumstances, we could not say that the error in giving the *Mann*-type instruction was harmless beyond a reasonable doubt. 583 P.2d at 833.

In both *Menard* and *Howard* we noted our approval of the position adopted by the United States Court of Appeals for the Fifth Circuit in *United States v. Chiantese*, 560 F.2d 1244 (5th Cir. 1977), *cert. denied, sub nom. Cerrella v. United States*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). There the court held that the giving of a *Mann*-type instruction was error, but that it might not always require reversal. Rather, the court indicated that it would view the error in the context of each case to determine if the accused had actually suffered harm from the instruction. 560 F.2d at 1255. Applying such analysis to this case, we find that reversal is not required.

█ In *Howard*, the *actus reus* of the offense, the taking of copper that was admittedly scrap, was an act that did not, in and of itself, create a strong inference that the actor possessed the *mens rea* of the offense; that is, the specific intent to deprive another person of his property.

---

4. *See, Mann v. United States*, 319 F.2d 404 (5th Cir. 1963) *cert. denied*, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964).

Hence, the key issue there was the specific intent element of the crime. Our disapproval of the language of the *Mann* instruction was on the ground that it raised the possibility that the jury *might* view it as shifting the burden of proof on the issue of specific intent. Since that was a closely contested issue in *Howard,* we reversed. Here, however, the act of taking the property of another by force does create a strong inference of the specific intent element of the crime of robbery, and the issue of whether Carman possessed the specific intent to steal did not become one of singular importance in this case. Given these considerations, we find that no actual harm was done to the appellant by the use of the *Mann*-type instruction in the context of this case. *See United States v. Schilleci,* 545 F.2d 519, 525 (5th Cir. 1977).

■ Next, Carman seeks reversal of his conviction on the ground that the trial court erred by failing to give the jury cautionary instructions on the oral admissions of a party. We note, however, that defense counsel neither requested such instructions nor objected to their absence at the time all the instructions were read to the jury. Under these circumstances, we find the objection waived and the issue unnecessary to address on appeal. *See* Alaska Criminal Rule 30(a); *Ladd v. State,* 568 P.2d 960, 968 (Alaska 1977); *Larson v. State,* 564 P.2d 365, 371 (Alaska 1977); *Evans v. State,* 550 P.2d 830, 843 (Alaska 1976).

Appellant also claims that the trial court committed reversible error in its instructions to the jury on accomplice testimony. Two instructions are at issue. The first read as follows:

A possible question may have been raised as to whether or not the witness, Kenneth Johnson, may have been an accomplice to the alleged offense.

The testimony of an accomplice is to be viewed with distrust.

An accomplice is generally defined as one who in some manner, knowingly and with criminal intent aids, abets, assists, or participates in a criminal act. To qualify as an accomplice a person need not com-

mit every element of the offense with which the defendant is charged; however, it is essential that he in some way associate himself with the venture, that he participate in it as something he wishes to bring about, or that he seek by his actions to make it succeed.

With the exception of the first paragraph, which the trial court chose to add over defense objection, this instruction is identical to one proposed by the defense counsel. Carman claims that there was competent evidence from which the jury could have found other witnesses, besides Johnson, to have been accomplices, and that therefore the addition of the first paragraph of the instruction improperly restricted the jury's consideration of this matter.

In *Beavers v. State,* 492 P.2d 88, 97 (Alaska 1971), we defined the term "accomplice" as follows: "An accomplice is one who in some manner, knowingly and with criminal intent, aids [and] abets, assists or participates in a criminal act." *quoting from Taylor v. State,* 391 P.2d 950 (Alaska 1964). In a later case, *Gordon v. State,* 533 P.2d 25 (Alaska 1975), we sought to clarify the matter further:

A person need not commit every element of the offense in order to be guilty as an accomplice. However, it is necessary that he in some way 'associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' Prior knowledge that a crime is about to be committed and concealment of that knowledge in itself won't make one criminally liable as an accomplice. Furthermore, once a crime has been committed, concealment of one's knowledge of the crime does not make one an accomplice. . . . Finally, mere presence at the scene of the crime is not in itself enough to make one an accomplice. [footnotes omitted]

533 P.2d at 29.

In this case, defendant renews his argument in the court below that there was sufficient evidence adduced to allow a reasonable jury to conclude that Steve Evans

and Don Drum, as well as Ken Johnson, were accomplices to the robbery.[5] If so, it is claimed, then the instruction improperly restricted the scope of the jury's deliberations and requires reversal. Thus, we must first determine whether a reasonable jury could have found, by a preponderance of the evidence,[6] that Evans and Drum were accomplices to the crime.

■ There was no evidence produced which placed either Evans or Drum at or near the Cinema II at the time of the robbery. Yet, as noted above, one who with the requisite intent aids and abets in the commission of a crime may also be deemed an accomplice.[7] In *Tarnef v. State*, 512 P.2d 923 (Alaska 1973), we had occasion to discuss the concept of aiding and abetting with some particularity:

> It can be inferred that the words 'aid and abet' are used synonymously with various combinations of the words assist, advise, counsel, procure, encourage, incite and instigate. Similarly, in *Thomas v. State*, 391 P.2d 18 (Alaska 1964), this court approved a jury instruction which read in part:
>
> > "'Aid and abet' means to help assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission." *Id.* at 25.

512 P.2d at 928.[8] Although both Drum and Evans may have had a motive for bringing about the robbery, as each testified their apartment rent payments were in arrears,

we believe that only Evans[9] could possibly have been found to have been an accomplice. While Drum appears to have had prior knowledge that a robbery was planned, there was no evidence that he actually did any overt act to help bring it about. Evans, however, testified that he bought two ski masks at Carman's request which he knew at the time would be used for a "hold-up," and that he paid his own money for them. This testimony alone would have been sufficient to allow the jury to conclude that Evans was an accomplice to the robbery.

■ We find, therefore, that the trial court did err by submitting an instruction to the jury which focused the issue of complicity on Johnson alone. We do note, however, that the remainder of the instruction did provide a clear, complete definition of the term "accomplice," and did properly instruct the jury that the testimony of an accomplice is to be viewed with distrust. As such, the jury might still have considered the issue of Evans' complicity unless it appears that the first paragraph of the instruction might be reasonably interpreted as precluding that consideration. Although we find the question a close one, regardless of whether or not the instruction is considered to be limited to Johnson's testimony, any error was harmless. *Love v. State*, 457 P.2d 622, 631 (Alaska 1969).

As his next point of appeal, appellant claims that the trial court erred in instructing the jury on the requirement of corroboration of accomplice testimony.[10] We have

---

5. At no time has appellant urged that these persons should be declared accomplices as a matter of law.

6. *See*, C. Torcia, 3 Wharton's Criminal Evidence, § 645 at 347 (13th ed. 1973).

7. AS 12.15.010 provides:
   "*Abrogation of distinctions between accessories and principals.* The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or, though not present, aid and abet in its commission, shall be prosecuted, tried, and punished as principals."

8. "[One who 'incites' the commission of a crime] is one who, with mens rea . . . supplies [another] with the weapons, tools or information needed for his criminal purpose, the one not being present either actually or constructively at the moment of perpetration."
   R. Perkins, Criminal Law, ch. 6, sec. 8 at 646 (2d ed. 1969).

9. We believe that there was also sufficient evidence of Johnson's complicity for that issue to have been presented to the jury, as it was here.

10. AS 12.45.020 provides:
    "*Conviction on testimony of accomplice and corroboration.* A conviction shall not be had

reviewed the challenged instruction and find no merit in this argument.

 It is also claimed that the failure to give the jury a cautionary instruction regarding admissions of a co-defendant, as requested by defense counsel, constituted reversible error.[11] The instruction was requested on the grounds that certain witnesses had testified as to incriminating statements allegedly made by Carman and Bean with such phrases as "they said" or "they asked". Much of this testimony was elicited during cross-examination by defense counsel, who also similarly phrased his questions in such plural form. After careful examination of these witnesses' testimony, in the context of the entire testimony of each, and the objections and corrections made during trial, we find that although it would have been preferable to give such a cautionary instruction, the trial court did not abuse its discretion in failing to give the requested instruction.[12]

 Appellant also claims that the trial court erred by allowing into evidence the holster that was found in Cherie Carman's purse during the search of the apartment. In support of this argument, Carman points out that the warrant here was issued only for a search of the premises, not of persons there, and that as a visitor, Ms. Carman's personal belongings would not be, under these circumstances alone, subject to a valid search.

In this case, the police did not know whether the purse belonged to a permanent resident of the apartment or a visitor. No one spoke out claiming ownership and that it should be exempted from the warrant, and we do not think that the police had a duty to solicit such a claim. It could have contained the pistol for which the warrant was issued as readily as any other container

on the premises. We think, therefore, that the police were justified in opening the purse and, upon discovering the holster inside, the requirement of a nexus between the holster and the offense under investigation was clearly satisfied and the police were thus entitled to seize the holster. *State v. Davenport*, 510 P.2d 78, 85 (Alaska 1973). Under these circumstances, we find that Carman had no reasonable expectation of privacy as to the purse or its contents, and thus find no error. We wish to emphasize, however, that our holding is limited to the precise facts of the case before us.

Carman also challenges his sentence on a number of grounds. First, he claims that he was denied his due process right to a fair sentencing hearing, arguing that the sentencing judge was improperly prejudiced against him; that the court relied on improper factors in imposing the sentence; and that he was denied his right of allocution because his sentencing hearing was held before his trial began on an unrelated murder charge. We have reviewed each of these claims carefully and find them without merit.

 Finally, appellant claims his sentence of ten years imprisonment with no time suspended was excessive. The record reflects that the sentencing judge properly considered all the factors relevant to sentencing which we specified in *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970), and under the standard we adopted in *Cleary v. State*, 548 P.2d 952, 953 (Alaska 1976), we are unable to conclude that Carman's sentence is clearly mistaken.

AFFIRMED.

on the testimony of an accomplice unless it is corroborated by other evidence which tends to connect the defendant with the commission of the crime; and the corroboration is not sufficient if it merely shows the commission of the crime or the circumstances of the commission."

11. The proposed instruction was based on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

12. Whether a particular instruction should be given is a matter committed to the sound discretion of the trial court. Alaska R.Crim.P. 30; *Buchanan v. State*, 561 P.2d 1197, 1207 (Alaska 1977).