John T. KRALICK, Appellant,

v.

STATE of Alaska, Appellee.

No. 5618.

Court of Appeals of Alaska.

July 16, 1982.

Robert Merle Cowan, Kenai, for appellant.

Rhonda F. Butterfield, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

OPINION

COATS, Judge.

John T. Kralick was found in possession of 108 Thai sticks (marijuana) and was charged with possession of depressant, hallucinogenic, or stimulant drugs for the purpose of sale or disposal to another person. AS 17.12.010 and 17.12.110(b). Kralick was tried before Superior Court Judge James A. Hanson and was found guilty. Judge Hanson deferred imposition of sentence for five years.[1] Kralick now appeals to this court challenging the constitutionality of the search which uncovered the drugs.

On the afternoon of February 16, 1980, Kenai Police Officer Randall E. Cordle received a phone call from someone who stated that he had information about a drug transaction that was to take place the following day. The caller stated that he chose to remain anonymous for fear of losing his job and out of concern for his family. He said that on February 17 an individual was going to fly from Kenai to Anchorage on Alaska Aeronautical Industries (AAI) in order to purchase approximately $2,300 worth of drugs.[2] He said that the individual would be dressed like an oil worker, would be carrying a duffle bag containing dirty clothes, and would be carrying the drugs in the bag upon his return from Anchorage. The informant also stated that the duffle bag would have petroleum stains on it. Furthermore, the informant reported that the individual would try to leave Kenai as close to 10:00 a. m. as possible and that he would meet a man and woman at the airport in Anchorage. The informant did not identify any of the individuals involved by name, and he did not state whether the individual leaving from Kenai was male or female.

While speaking with Officer Cordle, the informant stated only that he acquired the information by personally overhearing a

---

1. As a special condition of probation, Kralick was required to serve 60 days in a correctional facility.

2. The informant never specified the type of drugs involved.

conversation. He did not say where or when he overheard the conversation, but Officer Cordle was under the impression that the informant had acquired the information fairly recently.

Acting upon this information Officer Cordle and Investigators Kallus and Malotte went to the Kenai airport on the morning of February 17. At approximately 11:40 a. m. they saw a white male adult enter the airport carrying a brown duffle bag. Officer Cordle stated that "both ends of the bag drooped as if it could have contained clothing." Officer Cordle further stated that he observed what appeared to be petroleum stains on the bag and that upon getting close to the bag he could smell oil.

A check with Alaska Aeronautical Industries (AAI) indicated that the individual had purchased a round trip ticket to Anchorage and was scheduled to return to Kenai on the 3:00 p. m. flight. The individual boarded the noon flight to Anchorage and he was followed by Investigator Kallus. Investigator Kallus testified that he observed the individual pick up his duffle bag directly from the baggage compartment of the plane and then meet a white female. Investigator Kallus saw them get into a white pickup; he got in a taxicab to follow them but eventually lost them. Investigator Kallus then returned to Kenai.

At 4:00 p. m. the individual returned to Kenai. He was the second person off of the plane, and he again picked up his duffle bag directly from the baggage compartment of the plane. He then entered the terminal, walked right past his wife who had been waiting for him, and headed straight toward the front door. At this time Officer Cordle and Investigator Malotte approached the individual and asked him if he would mind answering a few questions.[3] The individual, John Kralick, agreed and they stepped into the privacy of the freight room.

Kralick was advised of his rights. In response to questions by Officer Cordle, Kralick stated that he went to Anchorage by himself and did not talk with anyone that he knew. Kralick also said that while he was in Anchorage he took a taxicab from the airport to a grocery store, did some errands, and then returned to the airport for his return flight to Kenai. Officer Cordle briefly explained why he and Investigator Malotte were discussing the subject of drugs and asked Kralick if he would consent to a search of his person. Kralick replied that he had no objection. Kralick emptied his pockets and permitted Investigator Malotte to search his person. However, when asked if he would permit a search of the duffle bag, Kralick became very evasive and defensive, and he stated that he wanted to talk to an attorney. At this time, the police seized the duffle bag although they did not arrest Kralick.

The police sought a search warrant based on the facts just described; Magistrate Jess H. Nicholas issued the warrant to search the bag. During the search of the duffle bag officers found a box wrapped in plain brown paper. The box was addressed to JoAnn Knutson, Box 760, Kalifonski Beach Road, Soldotna, 99669. Inside the box the police found 108 Thai sticks wrapped in a plastic bag, weighing just under one pound.

Prior to trial Kralick moved to suppress the Thai sticks as the fruit of an illegal search, but the motion was denied. Kralick then made a motion to reconsider that was also denied. In this appeal Kralick now renews his challenge to the search.

## I. WAS THERE SUFFICIENT BASIS FOR THE SEARCH WARRANT?

The primary focus of this appeal concerns Kralick's contention that the issuance of the search warrant based upon the informant's tip violated the requirements of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12

---

3. At this time, Investigator Kallus was observing Kralick's wife who circumnavigated her husband and appeared to be evasive when she saw Investigator Malotte talking to her husband. Investigator Kallus then approached Kralick's wife who said that Kralick had gone to Anchorage to see his sister and then she stated, "I'm not my husband's keeper." Mrs. Kralick had tears in her eyes and she appeared to be somewhat shaken up.

L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In *Aguilar*, the well-known two-pronged test was established to evaluate the sufficiency of an informant's tip as the basis for a finding of probable cause to issue a search warrant. Specifically, *Aguilar* directs attention to 1) "the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were," and 2) "the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was 'credible' or his information 'reliable.'" *Aguilar v. Texas*, 378 U.S. at 114–15, 84 S.Ct. at 1514, 12 L.Ed.2d at 729 (citation and footnote omitted). Essentially, it is Kralick's contention that the search warrant in issue fails to pass constitutional muster under either prong of analysis. We disagree.

### A. The Basis of the Informant's Information

■ In assessing "the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were," it must be determined 1) whether the tip was based on the informant's personal knowledge, or 2) whether absent an allegation of personal knowledge the information supplied was so detailed as to support an inference of personal knowledge. *Davis v. State*, 499 P.2d 1025, 1029 (Alaska 1972), *rev'd on other grounds*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Accord *Spinelli v. United States*, 393 U.S. at 416, 89 S.Ct. at 589, 21 L.Ed.2d at 644.

■ Kralick first argues that there was no direct allegation of the informant's personal knowledge, stating,

The testimony stated that the anonymous informant overheard a conversation. It did not state when, where, or how this anonymous informant overheard the alleged conversation, nor did it state who was participating in the conversation. It is entirely possible then [sic] the anonymous phone caller was reporting a conversation he heard fourth or fifth hand three or four months ago.

The state, in its brief, directly disputes Kralick's allegation that the informant lacked personal knowledge. As the state points out, the informant told Officer Cordle that "he did personally overhear the conversation of the transaction." The state further argues,

Additionally, the caller had refused to provide certain information relating to the name of the person involved in arranging the transaction or the trip, because of a fear of losing his job and a fear for his family. The caller refused to say where the conversation which he had heard had taken place. From these refusals, an inference can be made that the caller's identity would be known to the persons involved should the caller relate the names of those involved or the place he had heard the conversation, and his job or his family would be in jeopardy.

We conclude that the informant's allegation that he did personally overhear the conversation of the transaction and the circumstances surrounding the call were factors which the magistrate could rely on in reaching his decision that the informant had personal knowledge of the drug transaction.

In addition to these factors the magistrate could draw the inference that the informant's tip was based on his personal observations because the information supplied by the informant was sufficiently detailed to support an inference of personal knowledge. In *Spinelli v. United States*, 393 U.S. at 416, 89 S.Ct. at 589, 21 L.Ed.2d at 644, the court stated:

In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.

*See also Keller v. State*, 543 P.2d 1211, 1217 (Alaska 1975); *Davis v. State*, 499 P.2d at 1029. The informant provided the date the suspect intended to travel (February 17)

and his destination (from Kenai to Anchorage, returning to Kenai on the same day). He knew the suspect's approximate time of departure from Kenai (approximately 10:00 a. m.), and he knew the airline on which the suspect would fly to Anchorage (Alaska Aeronautical Industries (AAI)). He gave a specific value as to the drugs that would be involved in the purchase ($2,300). He stated how the suspect would be dressed and what he would be carrying (he would be dressed like an oil worker and would be carrying a duffle bag containing dirty clothes; the bag would be oil stained). He knew where the drugs would be located (in the duffle bag). The information supplied to the magistrate was certainly detailed enough to support the inference that the informant was reporting a specific crime. The court in *Keller v. State*, 543 P.2d at 1219, summarized the facts which it found sufficient to establish an inference that the informant's knowledge had a reliable basis:

> Instead of a report of general criminal activity, the information here related to a specific crime being committed under certain specified circumstances. At the very least, the informant's tip was that Keller was transporting a large amount of illegal drugs to Ketchikan, Alaska; that Keller was going to fly to Ketchikan on a specific carrier; and, that the drugs were being carried in a specific type of container, a blue suitcase. Thus, that tip contained details of a specific crime with information on how the defendant was going to travel, destination of the trip, and a specific description of the method of transporting the drugs.

We believe that the information supplied in this case is very similar to the information supplied in the *Keller* case and that the magistrate could conclude that the informant's information was based on firsthand knowledge. *See also Schmid v. State*, 615 P.2d 565, 574–75 (Alaska 1980).

**B. The Credibility of the Informant or the Reliability of His Information**

■ The second prong of *Aguilar-Spinelli* directs an inquiry into "the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable.'" The Alaska Supreme Court expanded upon this in *Davis v. State*, 499 P.2d at 1029, where it stated,

> This reliability might be established by demonstrating past reliability, by independent corroboration of incriminating facts[4] by the police, or through the personal identity and involvement of the person giving the information. [Footnotes omitted, footnote added.]

In Kralick's case the credibility of the informant was demonstrated by police observations. Officer Cordle testified before the magistrate that a man dressed like an oil worker and carrying an oil stained duffle bag traveled on Alaska Aeronautical Industries (AAI) from Kenai to Anchorage and back on February 17. Furthermore, the fact that the man flew to Anchorage and then back to Kenai a few hours later was consistent with the fact that the suspect was conducting a drug purchase in Anchorage.[5] Kralick's actions when he arrived at the airport were also suspicious and tended to confirm the inference that he was involved in a drug transaction. Kralick's wife was in the airport when he returned from Anchorage and although Kralick saw her, he went immediately toward the airport door. When the police questioned Kralick, he said he had taken a taxi from the airport and did not talk to anyone he knew in Anchorage. This story conflicted with Investigator Kallus' testimony that he followed Kralick to the airport in Anchor-

---

**4.** Kralick argues that the police must corroborate specific incriminating details in order to demonstrate that an informant is credible. However, the supreme court specifically did not adopt the requirement that the corroboration of incriminating facts was necessary to demonstrate an informant was credible in *Schmid v. State*, 615 P.2d at 577. *Cf.* 1 W.

LaFave, Search and Seizure, § 3.3 at 556–57 (1978).

**5.** Kralick left on the noon flight and had reservations to return on a 3:00 p. m. plane the same day. His plane was delayed and actually arrived in Kenai about 4:00 p. m. Flight time from Anchorage to Kenai is approximately 30 minutes.

age where he met a woman who drove him away in a white pickup. Kallus also testified that he talked to Kralick's wife, who said that Kralick had gone to Anchorage to see his sister. Kallus described her as being "shaken up" by the events. We conclude, taking all the factors into consideration, that the informant's tip was sufficiently corroborated by independent observations of the police so that it was reasonable for the magistrate to conclude that the informant's information was reliable.

## II. DID THE SEARCH WARRANT SUPPORT THE SEARCH OF THE PACKAGE ADDRESSED TO JOANN KNUTSON FOUND WITHIN KRALICK'S DUFFLE BAG?

The search warrant that was issued authorized a search of Kralick's duffle bag. In conducting the search of that bag the police found a wrapped package addressed to JoAnn Knutson; the police opened the package and found the contraband. On this point of his appeal, Kralick contends that even if the search warrant authorized the search of his duffle bag it did not authorize the search of the package.

Kralick cites *Commonwealth v. Platou*, 455 Pa. 258, 312 A.2d 29 (1973), and *State v. Nabarro*, 55 Haw. 583, 525 P.2d 573 (1974), in support of his contention that the search warrant for the duffle bag did not extend to a search of the package within the duffle bag. *Nabarro* involved a search pursuant to a search warrant for a hotel room where the police suspected two men of having drugs. Sandra Nabarro was a visitor in the hotel room when it was searched and her purse was located at her feet when the police entered the hotel room with the warrant. Shortly after the police entered, Ms. Nabarro picked up her purse and walked toward the bathroom. The police seized the purse and searched it, finding marijuana. The Supreme Court of Hawaii held on these facts that the warrant for the hotel room did not authorize a search of Ms. Nabarro's purse where her only connection with the place to be searched was the fact that she happened to be there as a visitor. *State v.*

*Nabarro*, 525 P.2d at 574. In *Platou*, the defendant also happened to be present in a friend's apartment when a search warrant for that apartment was served. During the search Platou claimed two suitcases as his; the police searched the suitcases and found marijuana. The Supreme Court of Pennsylvania held that the search warrant for the apartment did not authorize the search of Platou's luggage. *Commonwealth v. Platou*, 312 A.2d at 32.

These cases seem clearly distinguishable from Kralick's case. In both *Nabarro* and *Platou* the search warrant was for a relatively large area—a hotel room or an apartment—as opposed to the instant case where the warrant only authorized a search of Kralick's duffle bag. Also, in *Nabarro* and *Platou* the third party owner of the exempt property was present and clearly in possession of the property. In Kralick's case, however, the package was clearly in Kralick's possession rather than that of the third party addressee.

The Alaska Supreme Court also seems to have emphasized that possession of the property by a third person is a necessary prerequisite for exempting a container from a warrant. In *Carman v. State*, 602 P.2d 1255, 1257 (Alaska 1979), the court described the search of an apartment, pursuant to a search warrant, for guns, clothing, and a duffle bag which were used in a robbery:

> At the time the warrant was served, appellant's sister Cherie Carman, was visiting the apartment. She and other people on the premises were instructed to line up along the wall in the living room while the officers conducted their search. Detective Keller, who was in charge of the investigation, then entered a back bedroom where Ms. Carman had been when the police first entered the apartment. There he found a closed, opaque purse lying on the floor. Upon opening it, he discovered and seized a brown leather holster matching the description of the one stolen in the robbery. He then learned that the purse belonged to Cherie Carman.

In upholding the search of the purse the court said:

In this case, the police did not know whether the purse belonged to a permanent resident of the apartment or a visitor. No one spoke out claiming ownership and that it should be exempted from the warrant, and we do not think that the police had a duty to solicit such a claim. It could have contained the pistol for which the warrant was issued as readily as any other container on the premises. We think, therefore, that the police were justified in opening the purse. . . .

*Carman v. State,* 602 P.2d at 1262. Kralick claims that the name on the package should have given the police notice that the container belonged to someone other than Kralick. We believe that the *Carman* case requires more than a name on a package before the police might have a duty to seek a second warrant. First, the fact that the package had the name of an unknown person who was not present did not establish that the package was not Kralick's. The state argues persuasively that a drug courier might very well choose to place a name other than his own on a package that contains illegal drugs in order to confuse the issue of ownership in the event he is apprehended. Second, at the time he was searched, even if the package did not belong to him, Kralick was the person in possession and control of the package. The *Carman* case seems to require that the third person who wishes to exempt his property from a search must assert that claim prior to the search. Even though Cherie Carman was present during the search as a visitor in the apartment, and the suspects in the robbery were two men, the court did not place an affirmative duty on the police to make any inquiry concerning the ownership of the purse before they searched it. *Carman v. State,* 602 P.2d at 1262.

Having reviewed the cases we conclude that the police were not required to obtain a second warrant to open the package found inside the duffle bag.

The judgment and conviction are AFFIRMED.