**Paul W. INGRAM, Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. 6784.**

Court of Appeals of Alaska.

July 19, 1985.

---

416

**418**

John M. Murtagh, Anchorage, for appellant.

Rhonda F. Butterfield, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Paul W. Ingram was convicted, following a jury trial, of one count of selling LSD, in violation of former AS 17.12.010, and one count of misconduct involving weapons in the third degree, in violation of AS 11.61.-220(a)(1). Superior Court Seaborn J. Buckalew, Jr., sentenced Ingram to serve concurrent terms of seven years with one year suspended for the drug charge and ninety days for misconduct involving weapons. On appeal, Ingram argues that the superior court erred in declining to suppress evidence illegally seized by the police. Ingram further asserts that he was not tried within the 120-day period provided for under Alaska Criminal Rule 45, that the prosecution improperly presented hearsay evidence to the grand jury, and that the trial court erred in admitting photocopies of buy-money and refusing to give an informer instruction to the jury. Finally, Ingram maintains that the sentence he received is excessive.

## I. SUPPRESSION ISSUES

The primary issues raised by Ingram relate to the propriety of the superior court's denial of his pretrial motions to suppress, which alleged that various items of evidence were illegally seized by the police and were therefore inadmissible. In order to place our discussion of these issues into context, it is necessary to review the circumstances surrounding Ingram's arrest.

### A. Facts

In April 1981, Police Investigator William Boitnott, while working as an undercover officer with the Anchorage Metropolitan Drug Unit (Metro), began buying LSD from James Roy Wilson. Boitnott eventually arranged to buy 6,000 "hits" of LSD from Wilson for $16,200. The sale was set for the evening of April 29, 1981. Boitnott, along with five other Metro officers, planned to perform a "buy-bust" by locating and arresting the source of Wilson's LSD.

At the appointed time, Boitnott, driving a pickup truck, met Wilson; Wilson directed Boitnott to an area near the intersection of Fifty-Third Avenue and Arctic Boulevard. Wilson originally wanted the full $16,200 in purchase money "fronted" to him, but Boitnott insisted on handling the transaction in installments and refused to provide Wilson any money until he received some LSD. Wilson agreed. He left Boitnott's truck and walked south along Arctic Boulevard until Boitnott lost sight of him. Boitnott then radioed other Metro officers in the area to inform them of the direction in which Wilson had gone.

Wilson returned to Boitnott's truck within two to three minutes. He gave Boitnott 1,000 dosage units of LSD in exchange for $2,700 in prerecorded buy-money. Following the exchange, Wilson again left the truck and disappeared by the same route. He returned in several minutes with another 1,000 dosage units of LSD, and Boitnott made another $2,700 payment. After making a third trip for LSD and receiving another $2,700, Wilson told Boitnott that his source had a total of only 4,500 hits, not 6,000 as initially agreed upon. Wilson had already delivered 3,000 hits; he agreed to produce the remaining 1,500 on his fourth, and final, trip. As soon as Wilson left, Boitnott again radioed to tell other Metro officers that Wilson was making his last pickup. Boitnott waited for Wilson in his truck, but after a period of five to seven minutes had elapsed he began to suspect that something was amiss.

In the meantime, other Metro officers had managed to track Wilson to 5308 Arctic Boulevard, a fourplex with two upstairs and two downstairs apartments. Access to all four apartments was provided by a common enclosed entryway, with stairs leading upward to apartments one and two and downward to apartments three and four. Officers believed that Wilson had entered one of the two downstairs apartments.

One of the Metro officers maintaining surveillance at the fourplex was Investigator Mark O'Brien. O'Brien was on foot; as he walked in the vicinity of the fourplex he noticed a man, later identified as Ingram, who was wearing a blue jacket, walking a large dog, and apparently watching O'Brien intently. When O'Brien went inside the entryway of the fourplex, Ingram approached, opened the glass door to the building and asked what O'Brien wanted. O'Brien responded by asking Ingram if he lived in the building. Ingram said he did not. O'Brien asked again and received the same answer. O'Brien, who was dressed in shabby clothes and had long hair and a beard, became concerned that his appearance might arouse suspicion and interfere with his surveillance. Thus, O'Brien identi-

fied himself as a police officer and instructed Ingram to go.

O'Brien watched as Ingram walked to the neighboring building, a sixteen-unit apartment complex. Ingram went up the stairs with his dog. Simultaneously, two men left an apartment, number 20, on the second floor; they met with Ingram on the stairs. Ingram and one of the men returned to the apartment. The third man, later identified as Thomas Heriford, remained, made an obscene gesture toward O'Brien, and watched. O'Brien instructed another officer to tell Heriford to leave the area.

O'Brien remained in the fourplex where Wilson was believed to be. By this time, O'Brien had been joined by Officer Stevens. Within about a minute after Ingram entered apartment 20 in the neighboring building, O'Brien heard the telephone ringing in apartment 3 of the fourplex. A male voice inside that apartment said, "cops, it's a bust," or words to that effect. O'Brien and Stevens listened but heard no further conversation. A girl, about eleven or twelve years of age, entered the fourplex and went down the stairs to apartment 3. She tried to enter the apartment but seemed startled when she found the door locked. The door opened from the inside, and the officers saw a woman pull the girl into the apartment.

O'Brien concluded that Wilson must be in apartment 3 and had been tipped off by Ingram from the neighboring building. Fearing that evidence might be destroyed, O'Brien had drawn his weapon and badge. When O'Brien knocked, Virginia Ingram answered the door. O'Brien saw Wilson sitting on the couch inside the apartment. He entered and arrested Wilson.

Upon entering the apartment, O'Brien asked if anybody else was present. Virginia Ingram told O'Brien that her husband was out walking the dog. When O'Brien asked if Ingram's husband had a large black dog, Virginia Ingram said yes. O'Brien immediately instructed Stevens to secure Wilson and ran to the neighboring building. He was joined by Investigator

Boitnott. . Only several minutes had elapsed since O'Brien's initial entry of apartment 3.

As O'Brien approached the door to apartment 20, he passed by the living room window and saw three men inside. O'Brien knocked on the door and yelled "police, open up." Nobody answered. O'Brien yelled again, and when there was still no response, he pushed open the door, which was unlocked. Ingram stood inside · the door, across the room from O'Brien. He was no longer wearing a jacket. O'Brien instructed Ingram to exit the residence, but Ingram did not move and would not leash his dog. Heriford and another man were with Ingram. Heriford, who resided in apartment 20, approached the door. Boitnott immediately led Heriford outside. He was not permitted to reenter. Ingram then moved closer to the door. O'Brien took a step into the apartment, grabbed Ingram, and pulled him outside. O'Brien frisked Ingram and asked if he had any identification. Ingram said he did not. O'Brien then arrested Ingram. The third man in the apartment was identified as Heriford's brother. He did not live at the address and he was allowed to leave.

Following Ingram's arrest, the focus of police attention shifted back to apartment 3 of the fourplex, where Ingram resided. After Wilson's arrest, police briefly checked apartment 3, primarily for their own protection. They discovered no significant evidence. No money or LSD had yet been found when Ingram was arrested. The police were thus interested in conducting a more thorough search of the apartment. Boitnott talked to Wilson, who was being held under arrest at the scene. He told Wilson that if the police did not recover the $8,100 they had spent for LSD, Wilson would be responsible for restitution. Wilson, who had previously said he did not want to talk with police, told Boitnott that the money was outside, to the rear of the apartment.

Boitnott and O'Brien went immediately to the back of the fourplex. There, they saw a fenced-in storage shed underneath the rear porch. Boitnott looked through the partially-open door of the shed and saw a plastic bucket, similar to a wastepaper basket, with a locked bank bag inside. He reached into the plastic bucket, removed the bank bag, and cut it open. Inside the bag, Boitnott found $2,100 in marked money, together with almost 1,800 dosage units of LSD and approximately one and one-half ounces of cocaine.

After discovering the bank bag, police shifted their attention back to apartment 20 of the neighboring building. Thomas Heriford, who lived in the apartment, had initially refused to consent to a search. Approximately two hours after Ingram's arrest, O'Brien spoke to Heriford and obtained Heriford's consent to search for LSD and marked buy-money. Heriford signed a written consent to search.

Upon obtaining consent O'Brien entered apartment 20, accompanied by Heriford. On the living room floor, near the area where Ingram was standing before his arrest, O'Brien saw a revolver in a shoulder holster, a blue jacket, and a wallet. The gun was fully loaded. O'Brien recognized the jacket as the one worn by Ingram when Ingram first entered the apartment. The wallet, although zipped shut, was bulging and apparently full of money. O'Brien seized the articles. He opened the wallet and found more than $9,000 in cash, of which $6,000 was marked money used in the drug buy. O'Brien also searched the pockets of Ingram's jacket and found a prescription bottle with Ingram's name on it.

Prior to trial, Ingram moved to suppress the wallet and its contents, the jacket, the prescription bottle, and the gun. He also moved to suppress the contents of the bank bag. After conducting a hearing, Judge Ripley denied Ingram's motions to suppress.

### B. Admissibility of Evidence Seized from Apartment 20—the Gun, the Jacket and the Wallet

Ingram advances several interrelated arguments against the admissibility of the articles seized from apartment 20, Heri-

ford's residence. Ingram begins by asserting that he was illegally arrested, because there was no probable cause to connect him with the LSD sale. Alternatively, Ingram contends that even if probable cause existed the police lacked authority to enter apartment 20 and arrest him without a warrant. Ingram reasons that the subsequent seizure of evidence from apartment 20 was the direct result of his illegal arrest and, consequently, that the evidence was subject to suppression under the fruit of the poisoned tree doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ We find no merit to Ingram's claim that the police lacked probable cause for his arrest. Police were aware from the manner in which Wilson conducted the LSD sale that Wilson was in all likelihood being supplied with the drugs by a source near Boitnott's truck. After Wilson completed the third delivery, he was followed to the lower level of the fourplex at 5308 Arctic Boulevard. Investigator O'Brien noticed Ingram walking his dog around a small area near the fourplex. Although Ingram was watching O'Brien intently, he twice denied any connection with the building. Even after being told to leave, Ingram continued to watch O'Brien. He contacted two men outside apartment 20; one of them remained outside, watching O'Brien and making an obscene gesture toward him. Based on this conduct alone, O'Brien had reason to believe that Ingram seemed unusually interested in and hostile to his presence outside the fourplex.

In directing Ingram to leave the fourplex, O'Brien had found it necessary to disclose that he was a police officer. Almost immediately after Ingram entered apartment 20, the telephone rang in apartment 3 of the fourplex, and O'Brien heard a male voice say, "cops, it's a bust." This prompted O'Brien to enter apartment 3, where he found Wilson. Moments later, O'Brien learned that the person he had talked to outside the fourplex was Virginia Ingram's husband. Given this information, O'Brien could reasonably infer that Ingram had tipped off the occupants of apartment 3. O'Brien realized the connection and, without hesitation, ran to apartment 20. O'Brien's repeated request to open the door went unheeded. When he opened the door, he saw that Ingram was no longer wearing the jacket that he had on when he entered the apartment.

The probable cause requirement has traditionally been interpreted broadly rather than restrictively. In *Dunn v. State*, 653 P.2d 1071, 1077 (Alaska App.1982), we said:

The United States Supreme Court's common-sense approach to definition of probable cause has consistently been followed in decisions of the Alaska Supreme Court. Accordingly, it is well established that probable cause for arrest will exist when facts and circumstances known to a police officer would justify a man of reasonable caution in believing that an offense had been or was being committed and that the person to be arrested is the one who committed it. [Citations omitted.]

Viewing the totality of the circumstances in the present case in light of this standard, we find that O'Brien had ample reason to believe that an unlawful sale of LSD had just occurred and that Ingram was involved at least as an accomplice to that sale.[1]

■ It is a closer question whether O'Brien was authorized to enter apartment 20 without a warrant for the purpose of

---

1. Ingram's liability as an accomplice to the LSD sale did not require a direct connection between Ingram and the illegal drugs. AS 11.16.100 provides: "A person is guilty of an offense if it is committed by the person's own conduct or by the conduct of another for which the person is legally accountable under AS 11.16.110, or by both." AS 11.16.110 provides, in relevant part:

A person is legally accountable for the conduct of another constituting an offense if

. . . . .

(2) with intent to promote or facilitate the commission of the offense, the person

(A) solicits the other to commit the offense; or

(B) aids or abets the other in planning or committing the offense. . . .

arresting Ingram. Warrantless searches and seizures are *per se* unreasonable unless they fall within a "few specifically established and well-delineated exceptions" to the warrant requirement of the United States and Alaska constitutions.[2] *See, e.g., Lupro v. State*, 603 P.2d 468, 476 (Alaska 1979); *Gallmeyer v. State*, 640 P.2d 837, 841 (Alaska App.1982). Thus, probable cause to arrest will not in and of itself justify the warrantless entry of a home by the police. *See Taylor v. State*, 642 P.2d 1378, 1383 n. 9 (Alaska App.1982), *citing Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

█ The state argues that O'Brien's entry of apartment 20 is covered by the exigent circumstances exception to the warrant requirement. On balance, we believe the state's argument is well taken. Exigent circumstances justifying a warrantless search or seizure may be established by the existence of probable cause, coupled with a "compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486, 498 (1978). In this case, probable cause existed for Ingram's arrest. The state contends that a compelling need to make the arrest immediately arose from the danger that evidence might be destroyed if the arrest was delayed.

█ In determining whether a sufficient showing of compelling need has been made, we must look to the totality of the circumstances of the case, balancing the nature of the exigency against the degree of intrusiveness of the warrantless search or seizure. *See Johnson v. State*, 662 P.2d 981, 985–86 (Alaska App.1983). In *Finch v. State*, 592 P.2d 1196, 1198 (Alaska 1979), the supreme court addressed the criteria to be considered when a claim of exigency is based on potential destruction of evidence:

Circumstances which are relevant to the determination include: the degree of urgency involved; the amount of time necessary to secure a warrant; the possibili-

ty of damage to police officers guarding the site while the warrant is sought; information indicating that the possessors of the evidence are aware the police are on their trail; and the ready destructibility of the evidence.

A mere showing of ready destructibility will not suffice; there must be good reason to believe that destruction of the evidence is imminent. *Id.*

█ Here, the police had ample reason to suspect that Ingram was associated with a sizeable illegal drug sale and that the sale had been unexpectedly interrupted when the presence of the police was discovered by Ingram. The police were aware that Ingram had already tipped off his wife and Wilson about the presence of police. The police were also fully aware that both the drugs and the money involved in the sale were capable of being readily concealed or destroyed. In its totality, the evidence indicates a clear and immediate likelihood that, unless Ingram was immediately arrested, he might destroy significant evidence and warn other persons potentially involved in the sale.

Our recent decision in *Johnson v. State*, 662 P.2d 981 (Alaska App.1983), is highly relevant. In that case, police received a report that a woman had been sexually assaulted. Upon being interviewed, the victim stated that the assault had occurred in Johnson's home, from which she had just managed to escape. Johnson's home was across the street from the scene of the interview. Police officers immediately knocked on Johnson's door, seeking information. Johnson appeared at an upstairs window and indicated that he would come downstairs. An officer then opened the front door and walked twelve feet into the downstairs hallway because she was afraid Johnson might have a gun. After Johnson came downstairs, spoke with officers and was identified by the victim, he was permitted to return to his bedroom to dress; however, he was accompanied to his bedroom by an officer. *Id.* at 983–84. After considering the totality of the circumstances, we

---

**2.** United States Constitution, amendment IV; Alaska Constitution, article I, § 14.

held that the warrantless entry of Johnson's home was justified by the police officers' need to assure personal safety and prevent destruction of evidence. *Id.* at 986–87.

In our view, the facts of the present case are comparable to those in *Johnson.* Both cases involve suspects who had just become aware of the presence of police officers and who were potentially highly motivated to destroy important evidence of a serious crime. In both cases, the warrantless police intrusion was minimal, consisting of a peaceful entry through an unlocked doorway by officers who had announced their presence and identity. We conclude that this case is governed by our decision in *Johnson* and hold that O'Brien's initial entry into apartment 20 fell within the exigent circumstances exception to the warrant requirement.

Ingram next challenges the validity of O'Brien's second entry into apartment 20. The second entry was made approximately two hours after Ingram's arrest, after O'Brien obtained Heriford's consent to search the apartment. Ingram contends that Heriford's consent was invalid. He notes that the written consent form executed by Heriford mistakenly referred to apartment 2 instead of apartment 20. Ingram points out that, following the search, Heriford stated that he had signed the consent form only because he was aware of the mistake and believed the form to be invalid.

■ Assuming that Ingram has standing to assert the validity of Heriford's consent,[3] we hold that his argument must be rejected. O'Brien and Heriford engaged in extensive discussions concerning the proposed search of Heriford's apartment. Prior to executing the written consent form, Heriford unambiguously told O'Brien that he would consent to the search of his apartment for LSD and buy-money. In executing the written consent, Heriford did nothing to manifest an intent to withdraw his verbal consent. Although the consent form misdesignated the premises as apartment 2, Heriford expressly stated on the form that he was giving consent to the police "to conduct a complete search of my residence." There was never any misunderstanding as to which residence was Heriford's. After signing the consent, Heriford accompanied O'Brien into apartment 20 and remained there during the search. At no time did Heriford indicate his disapproval of O'Brien's entry into apartment 20.

■ Given these circumstances, Heriford clearly and unequivocally consented to the search of his residence. *See Brown v. State,* 684 P.2d 874, 880 (Alaska App.1984), *petition for hearing granted* (Alaska, October 4, 1984). The error in designating Heriford's residence as apartment 2 and Heriford's uncommunicated belief that the error would render the consent form technically invalid provides no basis for vitiating Heriford's consent.[4]

Ingram's final contention with respect to the search of apartment 20 is that, even assuming the search of the apartment was valid and the seizure of the gun, the jacket and the wallet was permissible, the police were not authorized to open and inspect the contents of the wallet or the jacket. In ruling on this issue, the superior court con-

---

**3.** *See generally Waring v. State,* 670 P.2d 357 (Alaska 1983). *Compare United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2541, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

**4.** Ingram has separately challenged the seizure of the gun and the jacket from the floor of apartment 20 as improper, arguing Heriford expressly consented only to a search of the apartment for LSD and prerecorded buy-money. This contention is without merit. O'Brien discovered the jacket and the gun on the living room floor of the apartment without exceeding the scope of the consent given by Heriford. Since both articles were in plain view and O'Brien had reasonable cause to believe that they constituted evidence of a crime, he was entitled to seize them. *See Reeves v. State,* 599 P.2d 727, 738 (Alaska 1979); *McGee v. State,* 614 P.2d 800, 806 (Alaska 1980), *cert. denied* 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981). *See generally* W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.1(c) at 629–30 (1978).

cluded that a warrantless search of the wallet and the jacket was proper because Ingram abandoned these articles by leaving them on the floor of the apartment. Both Ingram and the state couch their arguments on appeal in terms of the superior court's abandonment finding. We believe, however, that the validity of the search is more appropriately analyzed by focusing on the scope of the consent Heriford gave to search his apartment.

■ Heriford agreed to a search of his apartment for LSD and marked money. His consent, while limited in purpose, was not restricted to any particular area of the apartment or to any specific containers or articles. It therefore authorized the police to search in any area of the apartment and in any containers found within the apartment, provided it was reasonable to believe that LSD or marked money might be found therein. The general rule is that, unless limited, a consent to search includes closed containers located within the area to which the consent applies:

> Assuming ... that a general and unqualified consent was given, then the boundaries of the place referred to mark the outer physical limits of the authorized search. Even within those limits, however, the police do not have carte blanche to do whatever they please. Certainly they may not engage in search activity which involves the destruction of property, and this would seem to bar breaking into locked containers. Somewhat more difficult is the question of whether such a general consent permits the opening of closed but unlocked containers found in the place as to which consent was given. Ordinarily, it would appear that the answer is yes, particularly if the police have indicated they are searching for a small object which might be concealed in such a container.

2 W.R. LaFave, *Search and Seizure* § 8.1(c) at 625 (footnotes omitted). *See also United States v. Covello*, 657 F.2d 151 (7th Cir.1981); *State v. Watson*, 416 So.2d 919 (La.1982); *People v. Mirenda*, 57 N.Y.2d 261, 455 N.Y.S.2d 752, 442 N.E.2d 49 (1982); *State v. Wargin*, 418 So.2d 1261 (Fla.App.1982). This rule closely parallels the general rule applicable in cases involving search warrants, where a warrant for the search of a residence is commonly held to authorize the opening and inspection of closed containers located inside that residence. *See, e.g., Carman v. State*, 602 P.2d 1255, 1257 (Alaska 1979); *Kralick v. State*, 647 P.2d 1120, 1125–26 (Alaska App. 1983).

Given the circumstances that led to the discovery of Ingram's wallet and jacket on the floor of Heriford's apartment, it was reasonable for O'Brien to expect that those articles might contain LSD or marked money. They were thus within the scope of Heriford's consent unless Heriford had no authority to consent—either actual or apparent.[5] Ingram points out that Heriford disclaimed ownership of the wallet and the jacket when O'Brien found them, thereby in effect placing O'Brien on notice that Heriford had no right to consent to their search. Moreover, Ingram notes that O'Brien apparently recognized that the jacket was the same one Ingram had been wearing when he entered Heriford's apartment. While we believe these considerations raise a substantial question as to whether Heriford had the authority to consent to a search of the wallet and jacket, we nevertheless conclude that under the specific facts of this case he did.

We do not suggest that the owner or occupant of a residence may under all or even most circumstances consent to a search of luggage or personal effects that have been left on the premises by a guest. Indeed, there is sound authority indicating that in many situations involving searches of personal property belonging to a guest, the consent of the host cannot be substituted for the consent of the guest. *See, e.g., United States v. Wilson*, 536 F.2d 883 (9th Cir.), *cert. denied* 429 U.S. 982, 97 S.Ct. 497, 50 L.Ed.2d 592 (1976). *See generally*

---

**5.** A valid consent to search may be given by one with actual or apparent authority to consent.

*See Nix v. State*, 621 P.2d 1347, 1349 (Alaska 1981).

2 W.R. LaFave, *Search and Seizure* § 8.5(d) at 738–59. *See also Gieffels v. State*, 590 P.2d 55 (Alaska 1979).

 Rather, the extent of a host's authority to consent to a search of personal effects belonging to a guest must be determined by a realistic assessment of the degree of privacy the guest might reasonably expect to receive from his host. Ownership of property, while obviously relevant to the issue of consent, is not determinative. As the United States Supreme Court has held, the pertinent inquiry is whether the consenting party "possessed common authority over or other sufficient relationship to the premises or effects to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974) (footnote omitted).[6]

 Whether there exists "common authority over or sufficient relationship to" an article of property is a question that must be answered on a case-by-case basis, and a wide variety of factors may be relevant to the inquiry:

> It is typically said that "a host can consent to a search of his premises occupied by a guest," for the guest, "not having even a colorable interest in the premises, is completely bound by the consent of a rightful occupant." But, such language

should not be read too literally; *Matlock* cautions that authority to consent is "not to be implied from the mere property interest a third party has in the property," and that it is instead useful to consider whether the defendant may be said to have "assumed the risk" that the other person might permit the search. It is fair to say, therefore, that host-consent cases may not be disposed of upon the simple proposition that the host was in possession of the premises. A closer look at the particular host-guest relationship, at least as perceived by the police, as it relates to the place searched and the nature of the objects seized, is necessary in order to make a sound judgment as to whether the guest had assumed the risk.

2 W.R. LaFave, *Search and Seizure* § 8.5(d) at 753–54 (footnotes omitted).

 In the present case, Ingram, anticipating the arrival of the police, simply placed his jacket, wallet and gun on the floor of Heriford's living room and elected to leave them there upon arrest. While Ingram may well have hoped that Heriford would leave his property undisturbed, he could not reasonably have expected it. Ingram must be held to have assumed the risk that Heriford might consent to a search of the property.[7]

---

**6.** In *Matlock* the Court went on to explain this statement in the following manner:

> Common authority is, of course, not to be implied from the mere property interest a third person has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on the mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, 39 L.Ed.2d at 250 n. 7 (citations omitted).

The approach taken in *Matlock* has been followed by the Alaska Supreme Court. Thus, in *Phillips v. State*, 625 P.2d 816, 817–18 (Alaska 1980), the Alaska Supreme Court, in upholding a third party's consent to the search of the defendant's home, emphasized that joint access

to and control over the premises, not ownership, were the determinative factors.

**7.** While Heriford disclaimed ownership, he did not object to the seizure or search of the articles or otherwise indicate that they were excluded from his consent to search. The supreme court's holding in *Phillips v. State*, 625 P.2d 816, 817–18 (Alaska 1980), is relevant on this score. In *Phillips*, the Court held that, where a valid consent by an occupant was given to enter and search a house, the lack of any objection when officers made subsequent entries into the house could be considered in determining whether the initial consent covered the subsequent intrusions.

Also relevant are two analogous cases considering the propriety of searching containers belonging to third parties when such containers are found inside premises or luggage that are the subject of a search warrant. In *Carman v. State*, 602 P.2d 1255, 1257 (Alaska 1979), the police, pursuant to a warrant, searched an apartment for evidence of a robbery. On the floor of a bedroom, they found and searched a

We find strong support for this conclusion in *United States v. Buckles*, 495 F.2d 1377 (8th Cir.1974). In *Buckles*, the police asked a homeowner for consent to search her premises; their request was granted. In the course of the search, the police discovered and arrested Buckles and his two companions, who were guests. The police also found and seized two jackets, which the owner of the house said were not hers. They searched the jacket pockets and found stolen money orders, which were used in evidence against the defendant at trial. The court of appeals expressly rejected Buckles' claim that the owner of the house could not consent to a search of Buckles' jacket. The court concluded that the owner, as primary occupant of the premises, was authorized to consent to the search.[8]

■ In summary, Heriford had access to and exercised possession and control over Ingram's wallet and jacket; he did so under circumstances in which Ingram could not reasonably have expected privacy from Heriford. Heriford thus had authority to consent to a search of those articles. Hence, we conclude that those articles were encompassed within Heriford's general consent to the search of apartment 20.

### C. Search of the Area Behind Apartment Number 3—The Bank Bag

Ingram next raises a series of arguments relating to the search of the storage area behind the fourplex and seizure of the bank bag from that area. The superior court ruled that the storage shed was a public area where Ingram was not reasonably entitled to an expectation of privacy. The court further ruled that the warrantless search and seizure of the bag were justified under the exigent circumstances exception to the warrant requirement. Alternatively, the court determined that placement of the bank bag in the storage shed amounted to an abandonment. Ingram questions the validity of the superior court's findings. We first consider the propriety of the court's ruling that the storage shed was a public area.

The evidence concerning the shed is not in dispute. The shed was located under the back porch of the fourplex where Ingram lived. It was attached to the building and was enclosed by the porch and the stairs to the porch. The porch provided access to the back doors of the upstairs units of the fourplex, apartments 1 and 2. Apartments 3 and 4, the downstairs units, apparently

---

purse belonging to the defendant, who, though present, was only a temporary visitor to the apartment. In upholding the search, the court pointed out that at the time the search was conducted, no one had claimed it or objected to its search under the warrant. The court further indicated that the police had no duty to solicit such a claim.

*Kralick v. State*, 647 P.2d 1120, 1125–26 (Alaska App.1982), dealt with a similar situation in which police, pursuant to a warrant, searched the defendant's duffel bag for drugs and found a parcel that had been wrapped for mailing and was addressed to another person at a different location. Police nevertheless proceeded to search the parcel. This court held that the search did not exceed the scope of the warrant. In so holding, we read *Carman* to impose a duty to object, noting that the defendant was in possession and control of the parcel at the time of the search but had not objected when it was searched pursuant to the warrant.

**8.** *Accord United States v. Carter*, 569 F.2d 801 (4th Cir.1977), *cert. denied*, 435 U.S. 973, 98 S.Ct.

1618, 56 L.Ed.2d 66 (1978). *Carter* involved a warrantless search of a coat liner that Carter left in the cab of a truck, which he normally drove during the course of his employment. Carter's employer, who owned the truck, had consented to a search of the truck by the police. The court held that the owner's consent encompassed the coat liner and that Carter, by leaving the coat liner in the truck, assumed the risk that his employer would consent to a search. *See also State v. Ray*, 274 N.C. 556, 164 S.E.2d 457 (1968) (host could consent to search of guest's suitcase where host had provided suitcase and suitcase was kept in host's bedroom rather than guest's bedroom). *Gebert v. State*, 85 Nev. 331, 454 P.2d 897, 900 (1969) (defendant who left container of marijuana with a friend assumed the risk that the friend would consent to a search of the container); *State v. Schad*, 129 Ariz. 557, 633 P.2d 366 (1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982) (upholding girlfriend's consent to seizure by police of credit cards from defendant's wallet, which she obtained from the defendant following his arrest).

did not have back doors. Ingram's kitchen window was adjacent to the door of the shed. The door to the shed was partially open, and some of the shed's contents could be seen from a nearby public sidewalk. Boitnott, using his flashlight, looked into the shed and saw a plastic bucket, similar to a wastepaper basket, with the locked bank bag inside. In addition, Boitnott also could see kitty litter, headboards, and other stored items, "primarily junk." Boitnott opened the shed door completely and removed the bag, which he proceeded to open. The superior court found that the shed served as a common storage area for residents of the fourplex.

■ These facts, even when viewed in the light most favorable to the state, do not support the superior court's conclusion that the storage shed was a public area. Since the shed was connected to the fourplex, it was clearly within the curtilage of the building.[9] It was therefore an area in which occupants of the fourplex, including Ingram, could expect privacy from public intrusion.[10]

■ The fact that the storage shed provided an area for the common use of all occupants of the fourplex may well have diminished Ingram's right to expect privacy from the other occupants. However, common use of the area by tenants did not deprive Ingram of his right to expect privacy from the public generally or from warrantless police intrusion in particular.[11] Nor could the presence of a nearby walkway or the partially open door of the shed justify a warrantless police entry. *See Erickson v. State*, 507 P.2d 508 (Alaska 1973).

The superior court's conclusion that the storage shed was a public area is clearly erroneous.

We must next consider whether warrantless entry of the shed and seizure of the bank bag was justified by exigent circumstances. In our view, this question is answered by the Alaska Supreme Court's holding in *Finch v. State*, 592 P.2d 1196, 1198 (Alaska 1979). That case involved a warrantless police entry of Finch's motel to search for evidence of an assault. A substantial period of time had elapsed between the time of the assault and the time of the search, and although police had been informed by the victim that Finch intended to destroy evidence of the assault, there were no specific circumstances indicating that destruction of evidence was imminent. The court in *Finch* noted two prerequisites to a valid warrantless search when destruction of evidence is threatened:

> There must be probable cause to believe that evidence is present, and the officers must reasonably conclude, from the surrounding circumstances and the information at hand, that the evidence will be destroyed or removed before a search warrant can be obtained.

*Id.* After reviewing the evidence in the record, the court found:

> [I]t was not reasonable for the officers to conclude from the surrounding circumstances and the information at hand that the evidence would be destroyed or removed before a search warrant could be obtained. The only valid course of action under the circumstances would have been to secure the room and station one

---

**9.** *See Work v. United States*, 243 F.2d 660 (D.C. Cir.1957) (storage area for garbage cans located under the front porch of a house held to be within the curtilage).

**10.** *Cf. Oliver v. United States*, —— U.S. ——, ——, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214, 225–226 (1984) (reaffirming the "open fields doctrine" but holding that the doctrine has no application within the curtilage—the area immediately surrounding the home as to which residents retain an expectation of privacy).

**11.** There is no evidence in the record to support a conclusion that the storage shed was normally

used by persons other than the occupants of the fourplex. The shed is thus readily distinguishable from areas such as unlocked common entryways of multi-unit buildings, where the public is admitted for the purpose of gaining access to individual apartments. *Cf. Hubert v. State*, 638 P.2d 677 (Alaska App.1981) (presence of police officers in the common hallway of a locked multi-unit building permissible in light of implied consent to officers' presence given by the occupant of one of the apartments in the building).

officer there while the other sought a search warrant.

*Id.* Accordingly, the court held that evidence seized during the search should have been suppressed.

█ We believe that in this case, as in *Finch,* there was insufficient information at the time of the search to support a conclusion that the bank bag or its contents would be destroyed or removed before a warrant to search the storage shed could be obtained. Investigator Boitnott first saw the bank bag through the open door of the shed approximately forty-five minutes after Wilson was arrested. In the meantime, Ingram had also been arrested and apartments 3 and 20 had been secured. From the time of the initial entry into apartment 3, at least five or six officers were continuously present at the scene. There were no apparent obstacles to securing the shed and its contents until a warrant could be obtained.[12] While it is true that no LSD or buy-money had yet been recovered and police did not yet know whether other people might be involved in the sale, these uncertainties could not have given rise to a reasonable expectation that the contents of the shed might be destroyed if the shed was secured pending issuance of a warrant. Similarly, nothing in the record suggests that officers expected an immediate search of the bank bag to reveal information leading to evidence in other locations, which might be lost if time were taken to obtain a warrant. We believe that, on this record, *Finch v. State* mandates the conclusion that the possibility of destruction of evidence did not justify a warrantless search of the storage shed and bank bag.[13]

The superior court's finding of abandonment remains to be considered. The court's conclusion on abandonment was based in part on its finding that the storage shed was a public area. To this extent, as we have already indicated, the court's conclusion was in error. The court further based its abandonment finding on the circumstances under which the bank bag was placed in the shed. Evidence presented at the suppression hearing showed that Ingram called his own apartment from Heriford's apartment shortly after O'Brien identified himself to Ingram as a police officer. Ingram spoke to Wilson, told him that the police were present, and, according to Wilson, instructed him to "throw the bank bag over the fence out the back window." Ingram's wife zipped and locked the bank bag and instructed her young daughter to crawl out the back window of the apartment and place the bag in the storage shed.

█ These facts, even when viewed in the light most favorable to the state, do not support a finding of abandonment. Despite Ingram's statement to Wilson, the bank bag was not thrown out the window. It was purposely hidden in the storage shed. Indeed, the superior court, in its findings, expressly recognized that the bag had been hidden. It is settled that intentional concealment of property is not the equivalent of abandonment. *See Smith v. State,* 510 P.2d 793, 796 n. 9 (Alaska 1973). *See also Work v. United States,* 243 F.2d 660 (D.C.Cir.1957). Nor is Ingram's statement controlling merely because it expressed a subjective intent to abandon the bag. Abandonment must be determined by

---

**12.** It is undisputed that a magistrate was available in Anchorage to issue search warrants. We further note that, shortly before discovering the bank bag in the shed, Investigator Boitnott had made arrangements to contact one of the occupants of apartment 3 at his place of employment in order to obtain a consent to search the apartment.

**13.** The state seeks to bolster its exigent circumstances argument by asserting that a substantial quantity of LSD was apparently missing and could have posed an imminent public danger if

it was abandoned in an area where it might be accessible to children or other passersby. This argument is not persuasive. If the bank bag contained all of the LSD that was unaccounted for, securing the storage shed pending issuance of a warrant would have provided adequate guarantees of public safety. On the other hand, if some or all of the missing LSD was hidden or abandoned elsewhere, an immediate search of the bank bag would have done nothing to diminish the danger that already existed.

use of an objective standard, not a subjective standard. *See United States v. Kendall*, 655 F.2d 199, 201–02 (9th Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982); *United States v. Jackson*, 544 F.2d 407 (9th Cir.1976). Here, Ingram's intent to have the bank bag thrown over the fence was never carried out and was unknown to Boitnott when he decided to seize and search the bag. If, under the circumstances known to them, the police acted unreasonably in conducting a warrantless search of the bank bag, it would be anomalous to hold that the search was rendered reasonable by Ingram's uncommunicated state of mind.

Moreover, even if Ingram's intent was controlling and prevented him from contending that a warrantless search of the bank bag was impermissible, his intent to abandon the bag did not confer on the police a right to enter the storage shed without a warrant. The shed was a constitutionally protected area in which Ingram had an independent right to privacy, which he never relinquished—subjectively or objectively. We conclude that neither Ingram's subjective state of mind nor his wife's concealment of the bag in the shed can support a conclusion that the bag was abandoned.

The superior court's finding of abandonment was also predicated in part on the bag's placement in a trash container, or wastepaper basket. However, as noted by the Alaska Supreme Court in *Smith v. State*, 510 P.2d at 795 n. 7, "the legality of the search turns not on the nature of the refuse but on whether the receptacle lies within the zone of protection afforded by the Fourth Amendment." In *Smith*, our supreme court upheld a warrantless search of garbage that had been commingled with other garbage from a multi-unit apartment building and put out for collection in a dumpster near the street. In upholding the search, however, the court in *Smith* emphasized that garbage which is kept indoors or which has not been commingled or placed in a public area for collection is not abandoned for purposes of the Fourth Amendment. *Id.* at 797–98.

This view finds strong support in other jurisdictions. *See, e.g., Work v. United States*, 243 F.2d 660 (D.C.Cir.1957); *State v. Chapman*, 250 A.2d 203 (Me.1969); *People v. Howard*, 50 N.Y.2d 583, 430 N.Y. S.2d 578, 408 N.E.2d 908 (N.Y.App.), *cert. denied*, 449 U.S. 1023, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980). *See generally* 1 W.R. LaFave, *Search and Seizure* § 2.6(b) at 366–75. A recent survey of federal cases indicates that the doctrine of abandonment has been applied to trash only when it is placed for collection in a public area, in close proximity to a public roadway, or in an outdoors, communal container. *See United States v. Michaels*, 726 F.2d 1307, 1312–13 (8th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984).

As we have previously indicated, the storage shed in this case was not a public area. Although it was near a walkway and a road, there is nothing in the record to indicate that garbage was placed in the shed for collection. The record does not even suggest that the occupants of Ingram's fourplex ordinarily used the storage shed for garbage containers. To the contrary, the trial court found that the shed was used primarily for storage, albeit of items that were "primarily junk."

We conclude that the objective circumstances in this case, as they appeared at the time of the seizure and search of the bank bag, do not support a reasonable conclusion that the bag was abandoned. Since exigent circumstances did not justify the warrantless seizure and search, we hold that the superior court erred in allowing the bag and its contents to be admitted into evidence.

Because admission of the bank bag and its contents was error, reversal of Ingram's conviction is required unless the error was harmless beyond a reasonable doubt. *Finch v. State*, 592 P.2d 1196, 1198 (Alaska 1979); *Richardson v. State*, 579 P.2d 1372, 1373–74 (Alaska 1978). In the present case, detailed evidence of Ingram's guilt was presented by the state through Wilson's testimony. The circumstances sur-

rounding the LSD sale and the arrest of Wilson and Ingram provided strong corroboration of Wilson's testimony. Ingram's wallet, jacket and gun, as well as the $6,000 in marked money contained in the wallet, independently established a compelling link between Ingram and the LSD sale. This evidence also constituted a forceful source of corroboration for Wilson's version of the offense. By contrast, the illegally seized items amounted to cumulative evidence which, at most, tended to corroborate Wilson's testimony only as to marginally relevant, relatively insignificant details of the transaction. Exclusion of these items would not have deprived the state of any direct evidence of guilt; nor would it appreciably have strengthened any evidence tending affirmatively to exculpate Ingram.

■ Even considering the stringent nature of the constitutional harmless error standard, it appears that a finding of harmless error is appropriate in this case, particularly since the evidence in the bank bag, while generally corroborating Wilson's testimony, did not in itself link Ingram to the transaction. We hold that the error in admitting the bank bag and its contents was harmless beyond a reasonable doubt.[14]

## II. SPEEDY TRIAL

Ingram contends that the superior court erred in refusing to dismiss the charges against him for violation of the 120-day speedy trial rule. Alaska Criminal Rule 45 requires that a defendant be brought to trial within 120 days of the arrest, arraignment or charge, whichever is first.[15] Ingram was arrested on April 29, 1981. His trial was eventually scheduled to begin on September 21, 1981, a date more than 120 days after the date of his arrest. Ingram objected to the trial date on speedy trial grounds. However, the state pointed out that Ingram was released from jail on April 30, 1981, without charges being filed. He was indicted on June 17, 1981, but was not arrested until July 23, 1981. The state claimed that the period of time from Ingram's indictment to his arrest was excluded from the 120-day speedy trial period because Ingram's whereabouts were unknown at the time.

After considering evidence concerning Ingram's whereabouts the superior court found that, during the period of time following his indictment, Ingram had attempted to avoid apprehension. The court alternatively found that the police had exercised due diligence in seeking to arrest Ingram after he was indicted. Accordingly, the court concluded that the time from Ingram's indictment on June 17, 1981, to his arrest on July 23, 1981, was excluded under Criminal Rule 45(d)(4), which provides for an exclusion in the computation of the 120-day speedy trial period for:

> The period of delay resulting from the absence or unavailability of the defendant. A defendant should be considered absent whenever his whereabouts are unknown and in addition he is attempting to avoid apprehension or prosecution or his whereabouts cannot be determined by due diligence....

Since exclusion of the period from June 17 through July 23 brought Ingram's scheduled trial date within the 120-day rule, the court rejected Ingram's objections and allowed the trial date to stand.

■ Ingram contends that the superior court erred in excluding the period of time

---

**14.** Judge Coats believes that the police may have been authorized to seize the bank bag after they saw it in the shed. However, in his view, it is unnecessary to decide this issue since even if the bank bag was erroneously admitted into evidence, admission of the bank bag was harmless error.

**15.** Alaska Criminal Rule 45 provides, in relevant part:

(b) A defendant charged with a felony, a misdemeanor, or a violation shall be tried within 120 days of the time set forth in paragraph (c) of this rule.

(c) The time for trial shall begin running, without demand by the defendant, as follows:

(1) From the date the defendant is arrested, initially arraigned, or from the date the charge (complaint, indictment, or information) is served upon the defendant, whichever is first....

between his indictment and his arrest. However, we believe there is substantial evidence to support the trial court's conclusion that Ingram's whereabouts were unknown and police exercised due diligence in attempting to find him.

After his April 29, 1981, arrest, Ingram and his family moved out of the fourplex at 5308 Arctic Boulevard without leaving a forwarding address. Evidence presented below establishes that the police thereafter made substantial efforts to find Ingram. The names of both Ingram and his wife were entered into the NCIC and AJIS computer information systems immediately after Ingram's indictment. Prior to the indictment, police contacted David DuBois, who had resided in apartment 3 with Ingram before Ingram's arrest. DuBois did not know where Ingram was but thought he was out of town, camping. DuBois informed police that Ingram was no longer working at his old job and said that Ingram's wife might be in Chitina. Finally, DuBois said that Ingram might be attempting to find a job at a local kennel, since Ingram liked dogs.

The police followed up on these leads. They called all Anchorage kennels to check for Ingram but obtained no useful information. Similarly, a call to Ingram's former place of employment disclosed that he was no longer working there. Efforts were also made to locate information concerning Ingram or his wife in Chitina, but no information could be found. In addition, the police ran a utility check on both Ingram and his wife and learned that no utilities were registered in either name. They contacted the telephone company and were told that there was no listing for either of the Ingrams. A record check at the Division of Motor Vehicles was conducted but disclosed that the Ingrams' drivers licenses listed old addresses. Finally, police contacted residents at 5308 Arctic Boulevard but were unable to gain any additional information. Ingram's arrest on July 23,

1981, resulted from a computer check that was run at the Department of Motor Vehicles when Ingram applied for renewal of his drivers license.

Ingram argues that these efforts were insufficient to constitute due diligence. He insists that a number of additional steps should have been taken. We disagree. In order to comply with the due diligence requirement, police must take reasonable steps to ascertain the whereabouts of the accused but need not follow up on every conceivable lead. *Spencer v. State*, 611 P.2d 1, 7 (Alaska 1980); *Odekirk v. State*, 648 P.2d 1039, 1042–43 (Alaska App.1982). In determining whether due diligence has been shown, our primary emphasis must be on the reasonableness of the efforts actually made, not on the alternatives that might have been available. We have previously found due diligence lacking where only *pro forma* efforts to locate a defendant were made and a number of significant leads were disregarded. *See Odekirk v. State*, 648 P.2d at 1041–42. Yet the information in this case reveals considerably more than a *pro forma* effort to find Ingram.

In *Odekirk v. State*, 648 P.2d at 1042–43, we held:

> In reviewing trial court fact findings we apply the "clearly erroneous" standard. *Johnson v. State*, 631 P.2d 508, 512 (Alaska App.1981). "A finding of fact is 'clearly erroneous' when, although there may be evidence to support it, the reviewing court is left with the definite and firm conviction on the entire record that a mistake has been made." *Troyer v. State*, 614 P.2d 313, 318 n. 11 (Alaska 1980) (citations omitted).

We are satisfied that the superior court's finding of due diligence is supported by the record and is not clearly erroneous. That court therefore correctly concluded that the September 21, 1981, trial date did not violate the speedy trial rule.[16]

---

16. Under Criminal Rule 45(d)(4) a showing of both due diligence and an attempt to avoid apprehension is not required. In light of our

conclusion that the record supports a finding of due diligence, it is unnecessary for us to consid-

### III. GRAND JURY HEARSAY

Ingram next contends that the prosecution improperly relied on hearsay evidence in presenting his case to the grand jury. During the grand jury proceedings, the state introduced evidence of a chemical analysis establishing that the drugs Wilson sold to Boitnott were LSD. This evidence was presented through the testimony of Investigator Boitnott, who stated he had in his possession a report of an analysis performed by a chemist from the Alaska State Troopers Crime Lab. Boitnott read the results of the report to the grand jury.[17]

Ingram argues that the state's reliance on Boitnott's hearsay testimony to apprise the grand jury of the results of the chemical analysis was improper under Alaska Criminal Rule 6(r). Ingram acknowledges that *McKinnon v. State*, 526 P.2d 18 (Alaska 1974), expressly approved the practice of presenting a laboratory report of chemical analysis to the grand jury in lieu of calling the laboratory technician who prepared the report. Ingram asserts, however, that *McKinnon* was inadequately reasoned, because the supreme court failed to note that Rule 6(r) had recently been amended to require compelling justification for presenting hearsay evidence. Ingram cites several post-*McKinnon* cases in which the Alaska Supreme Court has refused to apply. the holding in *McKinnon*. Ingram concludes that *"McKinnon* is old law." *See, e.g., Metler v. State*, 581 P.2d 669 (Alaska 1978) (hearsay testimony concerning the results of handwriting analysis inadmissible before the grand jury absent a showing of credibility and reliability); *Adams v. State*, 598 P.2d 503 (Alaska 1979) (hearsay evidence concerning treating physician's opinion of victim's medical condition inadmissible before the grand jury without a showing of compelling justification).

We believe it premature to declare that *McKinnon* is "old law." The supreme court has continued to recognize the validity of that decision. *See Adams v. State*, 598 P.2d 503, 508 (Alaska 1979); *Metler v. State*, 581 P.2d 669 (Alaska 1978); *State v. Gieffels*, 554 P.2d 460, 465 (Alaska 1976). Moreover, although the court, in *Metler* and *Adams*, refrained from broadening the *McKinnon* rule, neither did it seriously question its vitality. In our view, *Metler* and *Adams* do not overrule *McKinnon* but simply distinguish between two classes of expert opinion: one class includes expert opinions based on accepted scientific procedures that yield objective results; the second includes expert opinions that are subjectively based or depend on procedures the reliability of which has not been established. *McKinnon* falls into the former class of opinions and *Metler* and *Adams* fall into the second.

▮ The report of chemical analysis in Ingram's case is virtually identical to the type of report considered by the Supreme Court in *McKinnon*. We therefore conclude that the superior court did not err in finding that reliance on hearsay was permissible and in denying Ingram's motion to dismiss the indictment.[18]

er whether Ingram was attempting to avoid apprehension.

17. The report of a fingerprint expert was presented to the grand jury by Officer Boitnott in a similar manner. This report was inconclusive, however, and would clearly have constituted harmless error even if improperly admitted. Accordingly, our consideration of the hearsay issue is limited to the chemical analysis of the LSD.

18. Ingram raises two subsidiary claims concerning the use of hearsay to present evidence of the chemical analysis in this case. These arguments require only brief attention. First, Ingram claims that it was error to rely on Boit-

nott's recitation of the chemist's report instead of admitting the report itself into evidence. While better practice would certainly have called for actual admission of the report, we decline to find error here. In testifying before the grand jury, Boitnott made it clear that he had the chemist's report with him and actually read from the report. There is no claim that Boitnott's recitation was inaccurate. Even if failure to admit the report itself was error, the error was clearly harmless.

Ingram's second claim is that the prosecution failed to comply with the requirement that a compelling reason for use of hearsay actually be stated on the record. Alaska R.Crim.P. 6(r); *Galauska v. State*, 527 P.2d 459 (Alaska 1974).

## IV. ADMISSIBILITY OF PHOTOCOPIED MONEY

██ Following Ingram's arrest, the marked bills that had been used to purchase LSD from Wilson were subjected to fingerprint testing. Upon completion of the testing, the bills were photocopied to preserve a record of their serial numbers; they were then returned to Metro for use in other drug cases. Over Ingram's objection, the trial court permitted the state to use the photocopies as evidence against Ingram at trial. Ingram contends that use of the photocopies was error and that the actual bills should have been preserved.

Prior to trial, Ingram entered into a stipulation concerning the results of the palmprint tests that were performed on the money. This stipulation was read to the jury and indicated that neither of the two prints found on the money matched Ingram's prints. There was no claim that the tests were inadequate or that further testing would have provided any material evidence favorable to the defense. On appeal, Ingram does not suggest what might have been accomplished by preservation of the marked money that was not accomplished by use of the photocopies. Nor has he alleged any prejudice resulting from the failure to preserve the actual bills. Under the circumstances, we conclude that admission of the photocopies did not amount to error.[19]

## V. INFORMER INSTRUCTION

Ingram's final argument on the merits is that the trial court erred in failing to instruct the jury to view Wilson's testimony with caution because Wilson was an in-

former. Ingram claims that an informer instruction was mandatory. *See Fresneda v. State*, 483 P.2d 1011, 1015 (Alaska 1971). At trial, Ingram requested that the jury be given Alaska Pattern Jury Instruction 1.32 on informer testimony. The instruction provides:

> The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest, or by prejudice against the defendant.

The trial court apparently was not convinced that Wilson could technically be considered an informer, since he did not agree to testify against Ingram until after Ingram's arrest. Accordingly, the court rejected the proposed informer instruction.

The trial court did, however, conclude that Wilson was an accomplice. It instructed the jury accordingly. Thus, the jury was told that Wilson's testimony "should be viewed with distrust.... [Y]ou should give it the weight to which you find it to be entitled after examining it with care and caution in light of all the evidence in the case." Ingram acknowledges that this accomplice instruction was properly given by the trial court. He nevertheless contends that the informer instruction was independently necessary and should have been given in addition to the accomplice instruction.

██ We reject Ingram's claim. The admonition in the accomplice instruction was,

In light of the Supreme Court's holding in *McKinnon,* there is reason to question the need for a formal, on-the-record statement of compelling justification when the prosecution relies on a laboratory report of chemical analysis. In any event, in the present case, the prosecutor made it clear to the grand jury that experts would not be called because it would be a waste of time to have them "sitting around the halls," waiting to testify. While this explanation might not suffice as "compelling justification" in some circumstances, *see Adams v. State,* 598 P.2d 503, 508 (Alaska 1979), and *State v. Gieffels,* 554 P.2d 460, 464–65 (Alaska 1976), it nonetheless makes

clear the prosecution's reliance on *McKinnon* as a justification for its use of the hearsay evidence.

**19.** We note that Alaska Rule of Evidence 1003 provides:

> *Admissibility of Duplicates.* A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

if anything, more favorable to Ingram than the admonition in the rejected informer instruction. The accomplice instruction warned the jury to view Wilson's testimony "with distrust," while the informer instruction merely advised that the testimony of an informer should be "examined and weighed ... with greater care than the testimony of an ordinary witness." While the proposed informer instruction did expressly advise the jury to "determine whether the informer's testimony has been affected by any interest, or by prejudice against the defendant," a similar admonition is plainly implicit in the portion of the accomplice instruction, which states that the testimony of an accomplice must be given "the weight to which you find it to be entitled after examining it with care and caution in light of all of the evidence in the case." We conclude that any differences in wording between the informer instruction that Ingram proposed and the accomplice instruction that the trial court gave are insubstantial.[20] Submitting both the accomplice and the proposed informer instruction to the jury would thus have resulted only in unnecessary and potentially confusing duplication. We hold that the trial court did not err in rejecting Ingram's proposed informer instruction.

## VI. SENTENCE

In addition to contesting his convictions Ingram argues that the sentence for his conviction of selling LSD is excessive.[21] Ingram was sentenced by Superior Court Judge Seaborn J. Buckalew to a term of seven years with one year suspended. Ingram's conviction for selling LSD was under former AS 17.12.010, which provided for a maximum possible penalty of twenty-five years' imprisonment. Former AS 17.-12.110(b)(1). At the time of Ingram's sentencing preliminary versions of legislation

revising Alaska's drug laws had passed both houses of the Alaska legislature but had apparently not yet been formally adopted. Under the revised code, Ingram's offense would now be classified as misconduct involving a controlled substance in the third degree, a class B felony. *See* AS 11.71.030(1). As such, the offense would be subject to a ten-year maximum sentence, with presumptive terms of four and six years for second and subsequent felony offenders. *See* AS 12.55.125(d).

When convicted, Ingram was thirty-one years of age. He had established a good history of employment and had no prior criminal record whatsoever. Relying on the sentencing provisions of the revised criminal code and on his favorable background, Ingram argues that a sentence imposing six years of unsuspended imprisonment is clearly mistaken. In particular, Ingram emphasizes our holding in *Austin v. State*, 627 P.2d 657, 657–58 (Alaska App. 1981):

> Normally a first offender should receive a more favorable sentence than the presumptive sentence for a second offender. It is clear this rule should be violated only in an exceptional case.

■ The state disputes Ingram's reliance on *Austin*, claiming initially that since the revised code is inapplicable to this case its sentencing provisions are irrelevant. This argument is mistaken. In sentencing persons convicted of offenses committed prior to adoption of the revised criminal code, provisions of the revised code, though not strictly applicable, are nonetheless highly relevant and deserve consideration as "the most recent expression of legislative policy in the highly subjective realm of sentencing." *Whittlesey v. State*, 626 P.2d 1066, 1068 (Alaska 1980).

Ingram's sentence, when evaluated under current law, is an exceptionally severe

---

**20.** There is no possibility in this case that the jury might have concluded that Wilson was an informer but not an accomplice. We note that the accomplice instruction actually given to the jury expressly stated that, before the jury could find Wilson's testimony to be truthful, he would

have to be considered, as a matter of law, to be an accomplice.

**21.** Ingram also received a concurrent ninety-day term for his conviction of the misdemeanor charge of misconduct involving weapons in the third degree. This sentence is not disputed.

one for a first offender. Under the revised code Ingram's six-year unsuspended term of imprisonment equals the presumptive term for a third felony offender convicted of a class B felony. Ingram's total sentence of seven years with one year suspended exceeds the third-offender presumptive sentence. Under the revised code, Ingram's sentence would, in the absence of exceptional circumstances, plainly amount to a violation of the *Austin* rule.

The state argues, however, that Ingram's case is a particularly serious one—one that would warrant exceptional treatment under *Austin* if the revised code applied. There appears to be considerable merit to the state's argument. Ingram sold a large quantity of LSD to the police. Given the total amounts of money and drugs involved in the case, Ingram easily falls within the most serious category of drug offenders: those who engage in large-scale, commercial sales. *See Waters v. State*, 483 P.2d 199 (Alaska 1971). Moreover, as the state correctly points out, several of the aggravating factors currently set out in AS 12.55.155(c) appear to be applicable to Ingram's case, the most significant being that Ingram personally transported to Alaska the LSD which he sold. *See* AS 12.55.155(c)(24).

Nevertheless, even accepting the state's characterization of Ingram's case, there is substantial reason to question whether a sentence approximating the presumptive term for a third-felony offender is justified. The large quantity of illegal drugs involved in Ingram's offense, though undeniably significant, is only one of many factors to be considered in imposing sentence. *Waters v. State*, 483 P.2d at 202. In two analogous cases, also involving first offenders with favorable backgrounds, we recently held that sale or possession for sale of large quantities of cocaine will render a case exceptional under the *Austin* rule, thereby permitting imposition of a sentence that is not substantially more favorable than the presumptive sentence for a second felony offender. *See Stuart v. State*, 698 P.2d 1218 (Alaska App., 1985); *Lausterer v. State*, 693 P.2d 887 (Alaska

App.1985). *See also Marin v. State*, 699 P.2d 886 (Alaska App., 1985). We recognized, however, that there are limitations on the extent to which the quantity of drugs could be relied on to justify an exceptionally severe first-offense sentence. Thus, we concluded that except in cases involving the highest echelon of drug dealers—the titans of the drug industry in Alaska—involvement of large quantities of cocaine would not, standing alone, justify an unsuspended term in excess of four years, the presumptive sentence for a second felony offender. *See Stuart v. State*, 698 P.2d at 1224; *Lausterer v. State*, 693 P.2d at 892.

Although Ingram's case involves LSD instead of cocaine, it seems similar in many respects to *Lausterer* and *Stuart*. To the extent these cases are similar, *Lausterer* and *Stuart* would compel the conclusion that Ingram's sentence is excessive and should be reduced to four years of unsuspended incarceration.

We recognize, however, that sound reasons might exist to conclude that Ingram's case is distinguishable from *Lausterer* and *Stuart*. Under the sentencing provisions applicable in this case, the sale of LSD was subject to a maximum possible penalty of twenty-five years imprisonment, a sentence that is substantially more severe than the maximum term then applicable to the sale of cocaine. *Compare* former AS 17.12.-110(b)(1) *with* former AS 17.10.200(a). At least two cases decided by the Alaska Supreme Court under the prior sentencing provisions indicate a willingness on its part to approve relatively severe sentences in cases involving the sale of LSD. *See, e.g., Wright v. State*, 501 P.2d 1360 (Alaska 1972); *Meyers v. State*, 488 P.2d 713 (Alaska 1971).

Moreover, although the amount of money involved in Ingram's illicit drug sale, as well as the total dollar value of the drugs he imported to Alaska, was not as great as the amounts of money involved in *Lausterer* and *Stuart*, it may well be that cocaine is simply a higher-priced drug and that,

consequently, Ingram's offense is substantially more serious than Lausterer's or Stuart's in terms of total dosage units involved. In this regard, Ingram's level of involvement with LSD, particularly his personal importation of the substance into the state, may place him squarely within the highest echelon of those involved in illegal LSD sales in Alaska. ' There is little information in the sentencing record, however, to permit any meaningful evaluation of these issues.

Similarly, Judge Buckalew, in imposing Ingram's sentence, appears to have placed considerable weight on the belief that LSD is a particularly dangerous drug. Yet it is noteworthy that under the revised code the penalties prescribed for illegal sale of LSD are identical to those for sale of cocaine. Nevertheless, it is at least conceivable that available information concerning the relative dangers of LSD and cocaine might provide an arguable basis to distinguish Ingram's case from *Lausterer* and *Stuart*. Again, however, the record is not informative on this point. No evidence was presented at the sentencing hearing to justify disparate treatment of similarly situated individuals convicted of selling different types of similarly classified drugs.

█ In summary, we believe that the current sentencing provisions of the revised criminal code should be given significant weight in deciding the sentencing issues presented here. In particular, the apparent similarity of *Lausterer* and *Stuart* necessitates a consideration of these cases in determining the appropriateness of Ingram's sentence. The current state of the sentencing record, however, does not permit an accurate comparison between this case, on the one hand, and *Lausterer* and *Stuart*, on the other. We conclude that a remand is necessary to permit resentencing in light of our decisions in *Lausterer* and *Stuart*. If, in imposing sentence on remand, the superior court determines that *Lausterer* and *Stuart* are not controlling, then the court should make express findings on the record to support its conclusions.

The conviction is AFFIRMED and this case is REMANDED for resentencing in conformity with this opinion.